38 F.3d 1161
 33 U.S.P.Q.2d 1001
 BABBIT ELECTRONICS, INC.; Sol Steinmetz; and Robert
Steinmetz, Plaintiffs-Counter-Defendants-Appellants,
v.
DYNASCAN CORPORATION, Defendant-Counter-Plaintiff-Appellee.
 No. 93-4947.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 25, 1994.
 
 Jeffrey A. Sarrow, Plantation, FL, for appellants.
 Mitchell R. Bloomberg, Adorno & Zeder, Miami, FL, Robert E. Wagner, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, for appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, Chief Judge, BLACK, Circuit Judge, and KAUFMAN*, Senior District Judge.
 PER CURIAM:
 
 
 1
 We affirm the judgment of the district court, 828 F.Supp. 944, essentially for the reasons set forth by the court in its Order on Foreign Law Issues and Amended Memorandum Opinion and Order, which appear in the appendix as Exhibits A and B, respectively.
 
 
 2
 AFFIRMED.
 
 APPENDIX
 EXHIBIT A
 ORDER ON FOREIGN LAW ISSUES
 
 3
 THIS CAUSE comes before the Court after a hearing on April 24, 1992, at 2:00 pm, before the undersigned United States District Judge. The hearing addressed the foreign law issues raised in Plaintiff's Notice of Foreign Law, filed on March 2, 1992, and in the parties' Joint Pretrial Stipulation.
 
 Background
 
 4
 In 1985, Babbit Electronics, Inc. ("Babbit") entered into an agreement with Dynascan Corporation ("Dynascan") that enabled Babbit to sell and market in Latin America cordless telephones bearing the Cobra trademark. This agreement provided that Babbit would pay Dynascan a royalty for the use of the Cobra name. Over the next two years, Babbit alleges that it paid $2,532,162 for the cordless telephones and that Dynascan received royalties of $254,662. Babbit also alleges that the agreement between the parties took the form of a licensing agreement and that Dynascan told Babbit that Dynascan owned the Cobra trademark in Latin America, or had protectable rights to the Cobra trademark in Central or South America. Dynascan alleges that the agreement took the form of a distribution agreement between a manufacturer and a trademark proprietor.
 
 
 5
 From late 1986 onward, it became known to the parties that counterfeit Cobra products were entering the Latin America market. Babbit requested that Dynascan contact the local authorities in Latin America about the counterfeit products because Babbit's sales were being affected by the counterfeit market. Babbit alleges that Dynascan misled Babbit into believing that Dynascan had a protectable trademark to license. Babbit states that in four South American countries (Brazil, Argentina, Venezuela, and Paraguay) where Babbit sold its product, this was not true.
 
 
 6
 Dynascan states that by virtue of its use of the Cobra trademark in South America, Dynascan's trademark in those countries is protected. Dynascan asserts that it can oppose the attempted registration by third parties of any similar mark and seek cancellation of any registrations of such a mark under the trademark laws of the South American countries at issue.
 
 Scope of Hearing
 
 7
 The Court limits the scope of this Order to the four countries in which Babbit sold Cobra cordless telephones--Brazil, Argentina, Venezuela, and Paraguay. As a result of the hearing, the Court seeks to answer the question of what the law is with regard to trademarks in each of the four countries. Thus, the law as set forth in this Order will be the law applied in determining the appropriate issues on the merits.[1]
 
 
 8
 At the hearing the Court heard from two expert witnesses as to the state of trademark law in the four countries at issue. Babbit brought forth Professor Keith Rosenn of the University of Miami School of Law as its expert witness. Dynascan brought forth Jeremiah D. McAuliffe, Esq., of the law firm Pattishall, McAuliffe, Newbury, Hilliar & Geraldson of Chicago, Illinois as its expert witness. The findings of this Court primarily comport with the testimony of Professor Keith Rosenn and the briefs submitted by Babbit.
 
 Findings of the Court
 A. Brazil
 
 9
 Brazil, a civil law country, employs the "attributive" system of trademark protection. All rights stem from registration of a trademark in Brazil, as opposed to use of a trademark. To secure legal protection, a trademark should be registered with the National Institute of Industrial Property (INPI)--the Brazilian patent and trademark office.
 
 
 10
 The critical legislation regulating trademarks in Brazil is the Industrial Property Code, Law No. 5.772 of December 21, 1971 ("the CPI"). The critical provisions of the CPI are Articles 2 and 59:
 
 
 11
 Art. 2. The protection of rights with respect to intellectual property is effectuated through: ... (b) the granting of registration: of industrial, commercial, or service trademarks; and advertising expressions or devices.
 
 
 12
 Art. 59. Whoever obtains registration in accordance with this Code shall be guaranteed in Brazil the ownership and the exclusive use of the trademark to distinguish his products, goods or services from other identical or similar products, goods or services, in the class corresponding to his activities.
 
 
 13
 Sole paragraph. The protection dealt with in this Article includes the right to use the trademark on papers, printed matter, and documents relating to the activity of the registrant.
 
 
 14
 The general rule is that a trademark must be both registered and used in Brazil in order to be protected. If the mark is used by the owner, the registration is valid for ten years. This may be extended for successive periods of ten years. If the mark is not used for two years from the date of registration or if its use is interrupted for two consecutive years, the registration of the mark will lapse. The owner of the registered trademark must use it as described in the certificate of registration. Any interested person may apply to INPI for a declaration that a mark has lapsed.
 
 
 15
 Under the CPI, a foreign trademark is considered one that has been filed regularly in a country that has a treaty or convention with Brazil, guaranteeing reciprocity rights for registration of Brazilian marks. A foreign mark should be filed in Brazil within the time limit of priority provided for in the treaty or convention. In order to substantiate the priority claim, the mark must be filed with INPI before the expiration of 120 days from the filing date in Brazil. Foreign marks may be registered directly in Brazil as Brazilian marks so long as the applicant proves that the product or service to be covered are related to his industrial, commercial, or professional activity in his country of origin. Foreigners and nationals that do not live in Brazil have to appoint a representative domiciled in the country, who must have power of attorney to receive judicial service of process. This document should be filed together with the application for registration or within 60 days after filing.
 
 
 16
 Trademark licensing in Brazil requires an agreement duly registered and approved by INPI to enable a Brazilian licensee to remit foreign currency legally and to deduct the payments as an expense for income tax purposes. Under Normative Act No. 15, in force from September 11, 1975 until February 27, 1991, the maximum royalty permitted by INPI for a trademark license was one percent of net sales, and that royalty was permitted for only the initial ten-year registration period.
 
 
 17
 Use of an unregistered mark by a third party without a license agreement that has been properly recorded with the INPI is not considered a use that inures to the benefit of the trademark owner. No payments for use of a foreign trademark can be made if the corresponding application for registration has not been filed in Brazil within the priority period. Licensing of a Brazilian trademark requires registration not only of the mark but of the licensing agreement.
 
 
 18
 Brazil is also a party to the Paris Convention of 1883, which provides protection for non-registered notorious marks. Article 6 bis (1) of the Paris Convention of 1883, as revised in Lisbon in 1958, provides:
 
 
 19
 The countries of the Union undertake, either administratively if their legislation so permits, or at the request of an interested party, to refuse or to cancel the registration and to prohibit the use of a trademark which constitutes a reproduction, imitation or translation, liable to create confusion of a mark considered by the competent authority of the country of registration or use to be well-known in that country as being already the mark of a person entitled to the benefits of the present convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well-known mark or an imitation liable to create confusion therewith.
 
 
 20
 The Court also finds that trademark registrations with the INPI can be annulled if the Brazilian registrant misappropriated a well-known foreign mark.
 
 
 21
 Under Brazilian law one can also sue for unfair competition. Included in acts of unfair competition in Brazil are the fraudulent diversion of another's customers and the use of false designations of origin.
 
 B. Argentina
 
 22
 Argentina, a civil law country, has also adopted the attributive system for trademarks. The rights in trademarks are acquired by registration, not by use. Article 4 of the Law of Trademarks and Designations, Law No. 22.362 of December 22, 1980, articulates this proposition:
 
 
 23
 Art. 4. Property in a trademark and the exclusivity of its use is obtained by its registration. In order to be the owner of a trademark or to exercise the right of opposition to its registry or its use, a legitimate interest of the soliciting party or the opponent is required.
 
 
 24
 A trademark's registration is valid for ten years. This may be renewed indefinitely for equal periods if the mark was utilized within five years prior to each expiration in the marketing of a product, the rendering of a service, or as part of designating an activity. (Art. 5) The mark lapses if not used within Argentina for five years prior to initiation of an action to nullify the mark. (Art. 26)Argentine law also protects commercial names based upon use rather than registration. Theoretically, a trademark and a commercial name are distinct concepts, but in practice there is some overlap. Articles 27 and 28 of Law 22.362 provide:
 
 
 25
 Art. 27. The name or sign that designates an activity, whether or not for profit, constitutes property for the purposes of this law.
 
 
 26
 Art. 28. Property in a commercial name is acquired by use and only in relation to the field in which it is utilized and should not be susceptible to confusion with any commercial names previously existing in the field.
 
 
 27
 Firms with a commercial name acquired by use may oppose registration of a trademark.
 
 
 28
 Trademarks may be transferred only if registered in Argentina. Article 6 of the Law of Trademarks and Commercial Names provides:
 
 
 29
 Art. 6. Transference of a registered mark is valid with respect to third parties, once inscribed in the National Directory of Industrial Property (Directorio Nacional de Propiedad Industrial).
 
 
 30
 Foreign trademarks become protected under Argentine law only after they are registered in Argentina. Argentina regards a foreign trademark registered in Argentina as a national trademark whose owner is domiciled abroad. The Argentine Law of Trademarks and Commercial Names, as well as its implementing decree, contain nothing specifically regulating trademark licensing except for Article 9, which states that when a trademark is registered in joint names, the owners must act in concert to license, transfer or renew the mark.
 
 
 31
 The Foreign Investment Law, Law 22.426 of March 12, 1981, imposes a registration requirement on all foreign patents and trademarks licensed to persons domiciled in Argentina. Article 1 of this statute provides:
 
 
 32
 All juridicial acts for consideration whose principal or secondary object is the transfer, assignment or licensing of technology or trademarks from persons domiciled abroad to individuals or public or private legal entities domiciled in Argentina, shall be included within the provisions of this law, provided that such acts have effect in Argentina. Patents and trademarks are to be registered with the National Institute of Industrial Property (Instituto Nacional de Tecnologia Industrial--INTI).
 
 
 33
 Article 2 of this law provides for additional registration and scrutiny by the Registry of Licenses and Transfer of Technology under the Ministry of Economy for all licensing agreements that require persons or legal entities domiciled in Argentina to make royalty payments abroad. If the license agreement is between independent parties, registration is for informational purposes only; governmental approval is not needed. Nonregistered agreements are considered valid, but payments made by the Argentine licensor are not tax deductible and the withholding tax rate is higher than it is for registered agreements. The need for prior governmental approval was relaxed by Emergency Law No. 23.687 of 1989.
 
 
 34
 Like Brazil, Argentina is a party to the Paris Convention. Argentine law 17.011 of November 10, 1966, ratifies the Paris Convention of 1883, and the revisions of Brussels of 1900, Washington of 1911, The Hague of 1925, London of 1934 and Lisbon of 1958. As in Brazil, the Argentine courts have provided some protection to a notorious mark registered abroad where a third party attempts to pirate by registering in Argentina.
 
 C. Venezuela
 
 35
 Venezuela, another civil law country, has adopted a mixed version of the attributive system of trademarks. Both registration and use are protected, but registration is required to enjoy exclusivity of use. Article 3 of the 1955 Law of Industrial Property provides:
 
 
 36
 Art. 3. The person in whose name an industrial invention, improvement, model or design, or a commercial trademark, theme or denomination has been registered on the corresponding registry's books is presumed to be the owner.
 
 
 37
 The statute does not say that the registrant is the owner, only that the registrant is presumed to be the owner. If one can prove he has a "better right" to the mark because of use, one can oppose registration of another or sue to cancel registration of a mark. Registration of a trademark at the Trademark Office confers exclusivity of use upon the owner for a renewable period of 15 years. (Arts. 30 & 31.) The right to exclusive use, however, is limited to a class of products registered in accordance with the official classification. Thus, Article 32 provides:
 
 
 38
 Art. 32. The right to use a trademark exclusively is acquired only in relation to the class of products, activities or firms for which they have been registered in accordance with the official classification established in Article 106.
 
 
 39
 Failure to use the trademark for two consecutive years results in the loss of the mark. (Art. 36(d).) Subsequent use or use by a non-registered licensee does not revive a trademark that has expired for lack of legal use under Art. 36(d). When assigning or transferring or granting any rights with respect to a trademark, this must be noted on the margin of the mark's registration. (Art. 46.)
 
 
 40
 The reason that Venezuela is regarded as having a mixed system is that a person who has used a trademark but has not registered it can successfully oppose registration of the mark to a third party, or, within two years of a third party's registration, request cancellation of the mark.
 
 
 41
 Venezuela is a party to the Andean Pact. Decision 24 of the Andean Group, adopted in Cartagena in 1972, contains basic provisions affecting common treatment of foreign trademarks and other intellectual property. Under the common scheme adopted by the Andean Pact countries, trademark ownership is based upon registration rather than use. An additional registration is required under the Andean Pact, and the specialized governmental body that is charged with implementation of Decision 24 in Venezuela is SIEX (Superintendencia de Inversiones Extranjeras--Superintendency of Foreign Investments), which began to function in 1975. All contracts or other agreements for the transfer of intellectual property, in any form or regardless of whether royalties or fees are permitted, must be approved and registered by SIEX or the Ministry of Energy and Mines in the respective areas of jurisdiction. Any trademark licensing agreement that is not properly registered with SIEX has no legal validity in Venezuela and cannot be defended in the Venezuelan courts. Article 18 of Decision 24 of the Cartagena Agreement provides:
 
 
 42
 Every contract on importation of technology and or patents and trademarks, must be examined and submitted for the approval of the competent body of the respective Member Country, which must appraise the effective contribution of the imported technology, by means of an estimate of probable profits, the price of goods containing technology, or other specific forms of measuring the effects of the imported technology.
 
 
 43
 Pursuant to Article 25, licensing contracts for the exploitation of trademarks of foreign origin in the territory of the Member Countries, may not contain restrictive clauses such as: a prohibition or limitation on exporting or selling in certain countries products manufactured under cover of the respective trademark, establishment of prices of sale or resale of the products manufactured under cover of the trademarks, or an obligation to pay royalties to the owner of the trademark for trademarks that are not used. Article 7 of Decree 746 of February 11, 1975, provides:
 
 
 44
 All technology, patent, and trademark contracts that foreign, mixed or national companies contemplate signing must receive prior Superintendency of Foreign Investments authorization and must be registered after signing with the Superintendency of Foreign Investments. The Superintendency must, in each case, decide within sixty legal working days following the day the petition is submitted, whether a contract is acceptable.
 
 
 45
 Although the Andean Pact has modified its common regime on foreign investment considerable, the registration requirement has been maintained. Articles 61, 62, and 71 of Venezuelan Decree 656 of August 12, 1985, continue the requirement, providing:
 
 
 46
 Art. 61. All contracts that are projected to be celebrated by foreign, mixed or national enterprises with respect to the importation of technology and use in exploitation of patents and trademarks, whatever the modalities, must be authorized and registered by the Superintendency of Foreign Investments.
 
 
 47
 Art. 62. All documents containing minutes, contracts or agreements of any nature, to be carried out within the national territory, whether or not they provide for payment or counter services, are subject to authorization and registration in accordance with the foregoing Article. Specifically subject to said authorization and registration are those relating to the following items:
 
 
 48
 1. Concession of the use or authorization for the exploitation of trademarks and distribution of products identified by trademarks owned by foreigners.
 
 
 49
 Art. 71. Payments of remuneration agreed to in the agreements or contracts referred to in Articles 61 and 62 of these regulations will be suspended until they are registered with the Superintendency of Foreign Investments.
 
 
 50
 On July 16, 1986, Venezuela adopted Decree 1200, which produced complaints that it was abandoning the Andean Pact common foreign investment and technology regime. Article 65 of Decree 1200, however, continues the prior registration requirement.
 
 
 51
 Art. 65. All contracts that foreign, mixed and national companies plan to execute for the importation of technology and on the use and exploitation of patents and trademarks, regardless of the forms adopted, must be authorized and registered by the Superintendency of Foreign Investment.
 
 
 52
 Article 66 provides that any technology contracts that did not contain clauses prohibited by Andean Pact Decision 24 and that did not provide for royalties in excess of 5% of net technological sales or 3% of net profits are automatically authorized, but still subject to the registration requirement. Article 67 states that any intellectual property licensing agreement intended to have effects within Venezuela has to be registered with SIEX.
 
 
 53
 The restrictions on technology licensing imposed by Decision 24 were relaxed in ANCOM Decisions 220 and 224, but the registration requirements were reiterated. On January 26, 1990, Venezuela adopted Decree No. 727 which was designed to implement decisions 220 and 224 of the Andean Pact. Article 62 of this Decree authorizes virtually all foreign technology licensing by foreign firms, but such license agreements must be presented to SIEX for registration within 60 days after their celebration. Article 64 makes it explicit that so long as a trademark license has effects in Venezuela, it must be submitted for registration with SIEX.
 
 
 54
 In addition to the Andean Pact and SIEX rules, Article 4 of the Venezuelan Industrial Property Law requires that trademark licenses must be recorded at the Trademark Office in order for use by the licensee to inure to the benefit of the trademark owner. Before recording a license at the Trademark Office, one must first record the license with SIEX.
 
 
 55
 Venezuela is not a party to the Paris Convention. Decision 85 of June 5, 1974, of the Andean Commission, however, contains language that provides some protection to notorious marks. Articles 58(g) and 58(j) state that trademarks cannot be registered in an Andean Pact country if they might be confused with "other prominently known and registered marks within the country or abroad, covering identical products or services" or cannot be registered except by their owners if they are translations of trademarks already registered in another language, or are well known foreign marks. Moreover, Venezuela's concept of the "better right" permits foreign trademark holders to secure protection against pirates who register foreign marks. Many years may pass before the legitimate owner is ultimately successful. Venezuela has no registry for notorious marks, which often pass examiners and are allowed to be registered by third parties.
 
 D. Paraguay
 
 56
 Trademarks in Paraguay, also a civil law country, are governed by the Trademark Law, Law No. 751 of July 20, 1979, as amended by Law No. 1258 of October 1, 1987. Like the other countries, Paraguayan law makes registration with the Directory of Industrial Property rather than use the basis for exclusivity. Article 15 provides:
 
 
 57
 The registration of a trademark in accordance with this law confers on the industrialist, merchant, or manufacturer the right to the exclusive use of the mark, and to oppose registration or use by any other who may directly or indirectly induce confusion between products and services, regardless of the class to which they belong, so long as there is any relation between them.
 
 
 58
 One who has registered a trademark abroad is entitled to protection in Paraguay only after registration. Article 16 provides:
 
 
 59
 The owner of a product or service trademark registered abroad shall enjoy the guarantees bestowed by this law once the mark is registered in the country. The owner and his duly authorized agents are the only ones who may request registration.
 
 
 60
 Unlike the other countries, use of a trademark in Paraguay is not required to preserve ownership rights in a trademark. Registration is valid for renewable ten year periods.
 
 
 61
 Article 30 of the Paraguayan Trademark Law requires that all licenses of trademarks be inscribed with the Directory of Industrial Property and that extracts from the licensing contract be published for five consecutive days in a newspaper in Asuncion, the capital city. Three copies of the contract, translated into Spanish, must accompany the request for registration. Article 29, as amended by Law 1258, requires that the licensee be a merchant, industrialist, or manufacturer who can prove residence in Paraguay and that he has the technical ability to produce or market the products or services.
 
 
 62
 Paraguay is not a party to the Paris Convention. The first applicant is normally entitled to registration, but the owner of an unregistered mark can oppose a bad faith application.
 
 
 63
 The 1929 Inter-American Convention for Trademark and Commercial Protection.
 
 
 64
 The Court finds that the 1929 Inter-American Convention for Trademark and Commercial Protection ("the 1929 Treaty") does not govern trademark rights in Brazil, Venezuela, and Argentina. The Court finds that the the 1929 Treaty does govern the legal status of a U.S. registered trademark being used in Paraguay.
 
 Article 1 of the 1929 Treaty provides:
 
 65
 The Contracting States bind themselves to grant to the nationals of the other Contracting States and to domiciled foreigners who own a manufacturing or commercial establishment or an agricultural development in any of the States which have ratified or adhered to the present Convention the same rights and remedies which their laws extend to their own nationals or domiciled persons with respect to trade marks, trade names, and the repression of unfair competition and false indications of geographical origin or source.
 
 
 66
 It is not sufficient that a person, not a national of one of the contracting countries, be domiciled in one of the countries; he must also have an establishment therein.
 
 
 67
 Article 2 of the 1929 Treaty states that the owner of a trademark who desires protection in a contracting country other than his own must apply for registration in that country.
 
 
 68
 Article 7 of the 1929 provides the following:
 
 
 69
 Any owner of a mark in one of the Contracting States in accordance with its domestic law, who may know that some other person is using or applying to register or deposit an interfering mark in any other of the Contracting States, shall have the right to oppose such use, registration or deposit and shall have the right to employ all legal means, procedure or recourse provided in the country in which the interfering mark is being used or where its registration or deposit is being sought, and upon proof that the person who is using such mark or applying to register or deposit it, had knowledge of the existence and continuous use in any of the contracting states of the mark on which opposition is based upon goods of the same class, the opposer may claim for himself the preferential right to use the mark in the country where the opposition is made or priority to register or deposit it in such country, upon compliance with the requirements established by the domestic legislation in such country and by this Convention.
 
 
 70
 Under Article 7 of the 1929 Treaty, the owner of a trademark protected in the U.S. has the right to oppose registration of an infringing mark in Paraguay by proving that the person applying for registration knew of the existence and continuous use of the U.S. protected mark in connection with goods of the same class. Article 7 also gives the successful opposer the preferential right to register the mark in his own name upon compliance with the requirements of Paraguayan law and the Convention. Article 7 also allows the U.S. owner who has not registered his mark in Paraguay to take whatever action is provided for in Paraguayan law to stop use of the mark by an infringer.
 
 
 71
 Articles 8 and 9 of the 1929 Treaty apply to the situation where the alleged infringer has already registered the infringing mark in Paraguay and the owner of the U.S. mark applies for registration, which is refused because of the prior allegedly infringing registration. The U.S. owner can sue to cancel the registration in Paraguay by showing that he enjoyed legal protection of the mark in the U.S., whether by registration or use, prior to the newcomer's registration of the infringing mark in Paraguay. Article 9 permits cancellation of the Paraguayan registration if the U.S. owner can show abandonment of the registered mark in Paraguay, or in the absence of such definition in Paraguayan law, nonuse of the mark for two years from registration or interruption of use for one year and a day shall be deemed abandonment.
 
 
 72
 Article 12 of the 1929 Treaty protects the rights of the U.S. owner in the event that his agent, representative, or customer registered the owner's trademark in Paraguay. In that event the U.S. owner can demand cancellation and registration in his own name by showing that he has acquired a legally protected right in the U.S. by registration, prior application or use.
 
 
 73
 Article 11 of the 1929 Treaty permits licensing of a trademark. The second paragraph provides:
 
 
 74
 The use and exploitation of trade marks may be transferred separately for each country, and such transfer shall be recorded upon production of reliable proof that such transfer has been executed in accordance with the internal law of the State in which the transfer took place. Such transfer shall be recorded in accordance with the legislation of the country in which it is to be effective.
 
 
 75
 This language does not say that the 1929 Treaty requires recording of the license. It only means that each country may require recording if it wishes.
 
 
 76
 Article 14, et seq., of the 1929 Treaty establishes an unqualified right of a prior user to protection of a commercial name (names of individuals, surnames, trade names used to denote a trade or calling, firm's names or names and titles of associations or corporations), with the need for deposit or registration. But Article 19 makes this protection dependent upon domestic legislation in the contracting states, which lessens most of its force.
 
 
 77
 Articles 20 through 22 of the 1929 Treaty provide for the right of nationals of Contracting States to avail themselves of remedies for unfair competition. Unfair competition under the 1929 Treaty includes all acts contrary to normal and honorable development of business activities as against third parties.
 
 Thus, it is hereby
 
 78
 ORDERED AND ADJUDGED that the Court shall apply the foreign law findings contained in this Order to the appropriate facts of this case.
 
 EXHIBIT B
 AMENDED MEMORANDUM OPINION AND ORDER
 
 79
 On December 22, 1989, Plaintiff Babbit Electronics, Inc. ("Babbit") filed this fraud and tortious interference cause of action against Defendant Dynascan Corporation ("Dynascan"). In response, Dynascan filed a counterclaim against Babbit seeking redress for a variety of trademark infringement and breach of contract violations. The complaint and the counterclaim were tried before the Court without a jury, commencing on November 12, 1992, and pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact and conclusions of law.
 
 I. FINDINGS OF FACT
 
 80
 1. Babbit Electronics, Inc., is a Florida corporation with its principal place of business at 1060 N.W. 1st Court, Hallandale, Florida, 33009.
 
 
 81
 2. Sol Steinmetz is an individual and a citizen of Florida. Sol Steinmetz is a principal shareholder of Babbit and is the Chairman of Babbit.
 
 
 82
 3. Robert Steinmetz is an individual and a citizen of Florida. Robert Steinmetz is a principal shareholder of Babbit and is the President of Babbit.
 
 
 83
 4. Dynascan is a Delaware corporation with its principal place of business at 6500 West Cortland Street, Chicago, Illinois, 60635.
 
 
 84
 5. This Court has jurisdiction of this matter pursuant to 15 U.S.C. Sec. 1121 and 28 U.S.C. Secs. 1331, 1332 and 1338, as well as the doctrines of pendent and ancillary jurisdiction.
 
 
 85
 6. Dynascan is the owner of United States Registration Nos. 1,054,247, issued December 14, 1976; 1,366,377 issued, October 22, 1985; 1,366,378, issued October 22, 1985; 1,367,356, issued October 29, 1985; 1,525,454, issued February 21, 1989; and 1,530,680, issued March 21, 1989, for its Cobra trademark and variations of the Cobra trademark. Each of these registrations are valid and subsisting and are listed on the Principal Register of the United States Patent and Trademark Office. As to Registrations 1,054,247, 1,366,377, 1,366,378, and 1,367,356, affidavits pursuant to Sec. 8, 15 U.S.C. Sec. 1058, and Sec. 15, 15 U.S.C. Sec. 1065, have been filed and each of these registrations is now statutorily incontestable.
 
 
 86
 7. Dynascan's trademark registrations nos. 1,054,247, 1,366,377, 1,525,454, and 1,530,680 are recorded with Customs bearing recordation nos. 83-136, 88-328, 90-130, superseding 89-391, and 90-129 respectively.
 
 
 87
 8. Dynascan distributes consumer electronic products including, but not limited to, citizens band radios, corded and cordless telephones, radar detectors, and telephone answering machines under its registered Cobra trademarks in the United States and in many countries around the world.
 
 
 88
 9. Dynascan currently uses its registered Cobra trademarks in the United States, including the State of Florida, and in interstate commerce.
 
 
 89
 10. Dynascan annually sells in excess of $150 million of Cobra products in the United States.
 
 
 90
 11. Dynascan sold a small number of cordless telephones and other products under the Cobra trademark in South America prior to its relationship with Babbit.
 
 
 91
 12. Since 1977, Babbit has been involved in the sale and distribution of electronics parts and cordless telephones in South Florida and South and Central America.
 
 
 92
 13. In 1978, Babbit began to sell and distribute cordless telephones manufactured by Dynascan bearing the Cobra trademark.
 
 
 93
 14. During the latter part of 1978, Babbit was also selling and distributing cordless telephones and electronic products bearing the federally registered trademark MCE, a mark owned by an affiliate of Babbit.
 
 
 94
 15. In the early 1980's, Babbit purchased certain overstock of Cobra cordless telephones from Dynascan for sale in South and Central America. This purchase was predicated on the Federal Communications Commission's ("FCC") decision to change frequencies for cordless telephones. The FCC allotted manufacturers of cordless telephones with the old frequency a grace period to sell the outdated cordless telephones. Dynascan had a large number of Cobra cordless telephones in inventory, and Babbit purchased certain models of this overstock for sale in South and Central America.
 
 
 95
 16. On August 16, 1985, Babbit and Dynascan entered into a contractual licensing agreement ("Agreement") pursuant to which Dynascan gave Babbit a license to use the Cobra trademark on certain models of cordless telephones in South and Central America.
 
 
 96
 17. The Agreement required Babbit to pay a royalty to Dynascan through back-to-back letters of credit, whereby Babbit would pay a higher unit charge to Dynascan than Dynascan would pay to the manufacturer of the telephones. Initially, Babbit paid a 10% royalty to Dynascan. The royalty was later lowered to 5% in late 1987 or early 1988.
 
 
 97
 18. The Agreement permitted Babbit to distribute the phones it ordered through Dynascan in South and Central America, but not in the United States.
 
 
 98
 19. The telephones ordered by Babbit through Dynascan pursuant to the Agreement were consigned to Babbit and shipped directly from the manufacturer to Babbit's bonded warehouse in Florida. The telephones were then stored in the bonded warehouse until they could be shipped to South and Central America.
 
 
 99
 20. Over time, the model numbers of the Cobra products that Babbit handled changed, but there were no changes in the basic terms of the Agreement. Dynascan inspected a sample of each new model of cordless telephone produced for sale under the Cobra trademark prior to the approval of production of any new model. Dynascan did not, however, inspect or receive a Model SA-660s cordless telephone.
 
 
 100
 21. In July, 1989, without Dynascan's knowledge, Babbit ordered 6,000 Model SA-660s cordless telephones bearing the Cobra trademark directly from Hyundai Corporation of Korea ("Hyundai"). The Model SA-660s telephones are upgrades of the Model SA-620s telephones that Babbit had ordered previously from Hyundai Corporation with Dynascan's knowledge and consent, pursuant to the Agreement. The Model SA-660s telephones are also identical to MCE Model 7312 telephones that Babbit had previously ordered from Hyundai Corporation for sale in South America under the MCE trademark.
 
 
 101
 22. In July, 1989, without Dynascan's knowledge, Babbit received 6,060 Model SA-660s cordless telephones bearing the Cobra trademark from Hyundai, including a 1% spare parts allowance.
 
 
 102
 23. The Cobra SA-660s cordless telephones ordered directly from Hyundai by Babbit in July of 1989 were shipped from Korea directly to Babbit's bonded warehouse in Florida.
 
 
 103
 24. Babbit did not notify Dynascan of its intention to order the Cobra SA-660s telephones from Hyundai prior to ordering them, and Babbit failed to notify Dynascan of the fact that it had ordered or received the Cobra SA-660s cordless telephones, even after the telephones arrived at Babbit's bonded warehouse in Florida.
 
 
 104
 25. The Cobra SA-660s telephones received by Babbit from Hyundai were MCE telephones that were relabelled as Cobra telephones.
 
 
 105
 26. Babbit paid no royalty to Dynascan for any of the Cobra SA-660s cordless telephones ordered and received directly from Hyundai in July, 1989.
 
 
 106
 27. In August, 1989, Babbit ordered 6,000 sets of Cobra nameplate labels and Cobra gift boxes for Model SA-620s cordless telephones directly from Hyundai, without Dynascan's knowledge. These labels and gift boxes were shipped directly from Korea to Babbit's bonded warehouse in Florida, without Dynascan's knowledge, in September, 1989.
 
 
 107
 28. "MCE" is a registered trademark of Metz Consumer Electronics, Inc. ("Metz"), an affiliate of Babbit. Robert Steinmetz and Sol Steinmetz are shareholders of both Babbit and Metz.
 
 
 108
 29. In August, 1989, without Dynascan's knowledge, Babbit ordered an additional 4,600 Model SA-660s cordless telephones bearing the Cobra trademark directly from Hyundai. At the same time, Babbit ordered 6000 gift boxes with Cobra SA-660s sticker labels directly from Hyundai without Dynascan's knowledge.
 
 
 109
 30. In September, 1989, without Dynascan's knowledge, Babbit received 4,646 Model SA-660s cordless telephones bearing the Cobra trademark, and 6000 Cobra SA-660s gift boxes bearing Cobra stickers. These telephones and gift boxes, manufactured by Hyundai, were shipped directly from Korea to Babbit's bonded warehouse in Florida.
 
 
 110
 31. Babbit failed to pay any royalties to Dynascan for any of the additional 4,646 Cobra SA-660s cordless telephones or 6000 Cobra SA-660s sticker boxes ordered and received directly from Hyundai.
 
 
 111
 32. In 1989, Babbit secretly shipped approximately 4,646 units of the Cobra SA-660s cordless telephones from the bonded warehouse in Florida to various points in South America. These units were contained in Cobra gift boxes bearing Cobra stickers that had been pasted over the "MCE" labels.
 
 
 112
 33. On November 30, 1989, and December 5, 1989, the United States Customs Service ("Customs") seized portions of Babbit's shipments of Cobra telephones. Customs seized a total of 8,145 cordless telephones from Babbit, pursuant to Sec. 526 of the Tariff Act of 1930. Of the seized units, there were 6,145 Model SA-660s cordless telephones bearing the Cobra trademark, and 2000 Model SA-620s cordless telephones bearing the Cobra trademark.
 
 
 113
 34. On January 12, 1990, Dynascan informed Customs that it did not consent to the importation of the seized telephones, and Dynascan requested their forfeiture. At no time prior to the seizure of the SA-660s cordless telephones did Dynascan have knowledge that Hyundai was producing SA-660s telephones for sale as Cobra telephones, rather than as MCE telephones.
 
 
 114
 35. Dynascan's recordation with Customs identified Babbit as an authorized distributor of Cobra products.
 
 
 115
 36. On February 1, 1991, the United States declined to prosecute the seizures of Babbit's cordless telephones bearing the Cobra trademark. The 8,145 seized telephones were released to Babbit. Subsequently, Babbit exported these telephones to Textiles Internacionales of Panama.
 
 
 116
 37. The Court finds that the testimony of Sol Steinmetz and Robert Steinmetz is not credible. In particular, the Court finds not credible the Steinmetz' assertions that they were told by Dynascan that they would receive exclusivity over the entire South American market for Cobra cordless telephones. The Court finds that any promises of exclusivity only referred to the specific cordless telephone models expressly listed in the Agreement and any models that were later verbally added to the Agreement. Dynascan made no intentional misrepresentations of fact to Babbit that would suggest that Babbit was the exclusive distributor for all Cobra products in South and Central America.
 
 
 117
 38. The Court finds that there is no credible evidence suggesting that Babbit would not have entered the Agreement if it had known that Dynascan did not actually possess registered trademark protection in South America, as opposed to "use" trademark protection. The Court finds that Babbit entered the Agreement with Dynascan to avoid violating Dynascan's United States trademark registrations and to procure the legitimacy that is associated with Dynascan's United States and foreign trademark registrations and "use" protection. In fact, it is clear from the testimony of Robert Steinmetz that Babbit needed the Cobra trademark to sell telephones in South America, because the MCE trademark had limited sales potential.
 
 
 118
 In addition, Dynascan did maintain a limited measure of trademark protection in South America, although it did not possess trademark registrations in most South American countries. Dynascan did not, however, file any administrative actions or legal challenges in South America to protect the Cobra trademark, primarily because of concerns about the judicial systems in several South American countries. (T.R. 106). Instead, Dynascan attempted to assert its trademark protection through the issuance of a letter of authenticity to Babbit in March, 1987.
 
 
 119
 39. The Court finds that the letter from Dennis Burke to Babbit, dated March 25, 1987, directly stating that, "Cobra owns trademark protection in many countries in South America," is not indicative of any fraud that allegedly occurred at the time that Babbit and Dynascan entered into their Agreement in August 1985. In addition, the Court finds that this letter does not state or directly imply that Dynascan owns trademark registrations, as opposed to trademark protection, in any particular South American country. This Court finds no credible evidence that Dynascan intended Babbit to believe that Dynascan had registered trademarks in South America.
 
 
 120
 40. Babbit is a sophisticated electronics dealer, but at no time prior to entering the Agreement or during the first four years of the contractual relationship did Babbit make any effort to determine whether Dynascan owned trademark registrations for Cobra in South America.
 
 
 121
 41. The contractual relationship between Babbit and Dynascan continued until Dynascan received knowledge that Cobra cordless telephones shipped by Babbit had been seized by Customs. Up to that point, the relationship had been mutually successful and highly profitable for both Babbit and Dynascan. Between 1982 and 1989, Babbit sold over six million dollars worth of Cobra products in South America, and Babbit received, on average, a 25% profit margin on all Cobra sales. Babbit's profits from its relationship with Dynascan totaled approximately 1.5 million dollars.
 
 
 122
 42. Babbit, Sol Steinmetz and Robert Steinmetz each offered the Model SA-660s Cobra cordless telephones for sale, and directed such sales, from Babbit's office in Florida. Sol Steinmetz and Robert Steinmetz controlled, directed and participated in these activities.
 
 
 123
 43. Dynascan is the owner of Korean Trademark Registration No. 59154 for the Cobra trademark.
 
 
 124
 44. Babbit, Sol Steinmetz and Robert Steinmetz intentionally used the Cobra trademark on the shipment of Cobra SA-660s cordless telephones that was exported to Panama in May, 1991.
 
 
 125
 45. Babbit's unauthorized use of the Cobra trademark on the Cobra SA-660s cordless telephones that were exported to Panama in May, 1991, is likely to cause confusion, mistake or to deceive customers into believing that the SA-660s cordless telephones are licensed, authorized, sponsored or approved by Dynascan. In addition, Babbit's unauthorized use of the Cobra trademark on the Cobra SA-660s cordless telephones is likely to cause consumers to confuse the Cobra SA-660s, an unapproved or unauthorized product, with the Cobra SA-620s, an approved product and authorized product.
 
 
 126
 46. The Court finds that the testimony regarding Dynascan's alleged tortious interference with Commtron is either not credible or is hearsay evidence. It is clear that Babbit was never told that it could not purchase products from Commtron, although Babbit's credit privileges may have been reduced or eliminated for a short period of time. In addition, the Court finds that the statements made by Dynascan to Commtron were not made with any malice towards Babbit. The statements were simply reflections of Dynascan's belief that Babbit had violated a contract and imported counterfeit Cobra products.
 
 
 127
 47. Babbit, Sol Steinmetz and Robert Steinmetz are the controlling force behind all of Babbit's sales of unauthorized Cobra products in South America, and have personally orchestrated such activities from Babbit's corporate office in Florida.
 
 
 128
 48. Babbit's sales of unauthorized telephones in South America prior to and after the seizure by Customs amounted to a total sum of $561,868.30. The five percent royalty that Babbit was required to pay to Dynascan on all Cobra sales, but failed to pay as to these unauthorized sales, amounts to a total sum of $28,093.42. Babbit's profits on these unauthorized sales was approximately 25% of the total sales, or $140,467.08.
 
 II. CONCLUSIONS OF LAW
 A. THE COMPLAINT: COUNTS 1, 2, AND 4
 
 129
 1. Fraudulent Misrepresentation & Declaratory Judgment
 
 
 130
 In Count I of the Complaint, Babbit claims that Dynascan engaged in fraud by falsely representing that it owned the Cobra trademark in various South American countries. Under Florida law, the essential elements of fraud include: (1) a false statement concerning a specific material fact; (2) a showing that the representor knew or should have known that the representation was false; (3) an intent that the representation induce another to act on it; and (4) consequent injury to the party acting in justifiable reliance on the representation. Royal Typewriter Company v. Xerographic Supply [Supplies], 719 F.2d 1092 (11th Cir.1983); Saunders Leasing System, Inc. v. Gulf Central Distribution Center, Inc., 513 So.2d 1303, 1306 (2nd Fla. DCA 1987).
 
 
 131
 The Court concludes that Dynascan did not make any false statements concerning specific material facts or any false representations that it held trademark rights in the Cobra trademark in South American prior to the date when the parties entered the Agreement. The only credible evidence presented by Babbit regarding false representations occurred after the signing of the Agreement between Babbit and Dynascan in 1985. Therefore, these statements cannot have been intended to convince Babbit to enter the Agreement. In fact, the Court finds that Babbit entered the Agreement with Dynascan to avoid violating Dynascan's United States trademark registrations and to procure the legitimacy that would be associated with Dynascan's United States and foreign trademark registrations and "use" protection. It is clear from the testimony of Robert Steinmetz that Babbit needed the Cobra trademark to sell telephones in South America, because the MCE trademark had limited sales potential.
 
 
 132
 Indeed, even the post-Agreement statements made by Dynascan to Babbit only represented that Dynascan had trademark rights or protection in South America, not that it possessed trademark registrations. This legal distinction is not a misrepresentation of fact because Dynascan did possess trademark protection, albeit "use" protection. Whether Dynascan chose to take advantage of that "use" protection by filing administrative actions in South American countries is irrelevant, because Dynascan clearly had that right and did not misrepresent its ownership of that right. Therefore, the Court concludes that Babbit has failed to prove by a preponderance of the evidence that Dynascan engaged in fraud.[1]
 
 
 133
 2. Tortious Interference with a Business Relationship
 
 
 134
 In Count IV of the Complaint, Babbit alleges that Dynascan has engaged in tortious interference with Commtron, one of Dynascan's domestic distributors and Babbit's suppliers. To recover for tortious interference, Babbit must prove: (1) the existence of a business relationship under which Babbit has legal rights; (2) knowledge by Dynascan of such relationship; (3) an intentional and unjustified interference with such relationship by Dynascan; and (4) damage to Babbit as a result of the breach of the relationship. T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc., 931 F.2d 816, 825-26 (11th Cir.), cert. denied [--- U.S. ----], 112 S.Ct. 658 [116 L.Ed.2d 749] (1991).
 
 
 135
 The Court concludes that Babbit has failed to demonstrate that Dynascan engaged in tortious interference because any interference in the relationship between Babbit and Commtron was justified by Babbit's breach of contract with Dynascan. The only statements that the Court found that Dynascan made to Commtron concerning Babbit reflected Dynascan's reasonable belief that Babbit breached the Agreement and imported counterfeit goods. See Ethyl Corp. v. Balter, 386 So.2d 1220, 1225 (3rd Fla. DCA 1980), cert. denied, 452 U.S. 955 [101 S.Ct. 3099, 69 L.Ed.2d 965] (1981) (Court held that under Florida law, a party is allowed to interfere in another's business relationship where the party acts in furtherance of its own interests, such as to protect a contract.). In addition, Babbit failed to introduce credible evidence to support its allegation that Dynascan expressly instructed Commtron that it should not deal with Babbit. Consequently, the Court concludes that Babbit has failed to prove by a preponderance of the evidence that Dynascan engaged in tortious interference with Babbit's business relationship with Commtron.
 
 B. DYNASCAN'S COUNTERCLAIM
 
 136
 Dynascan's counterclaim sets forth a number of allegations, including claims that Babbit engaged in unfair competition, violated a number of federal and state trademark statutes, and breached the Agreement. The Court will initially address the breach of contract issue. The Court will then address Dynascan's trademark infringement claim and counterfeiting claim. Thereafter, the Court turns its attention to Dynascan's unfair competition claim, including the common law claim for unfair competition and the two statutory state law claims. Finally, after a brief analysis of Dynascan's tariff act claim, the Court will conclude with a discussion of the imposition of damages.
 
 1. Breach of Contract[2]
 
 137
 The express terms of the Agreement between Babbit and Dynascan are contained in the August 16, 1985 letter sent from Dynascan to Babbit. In this Agreement, Dynascan gave Babbit a license to use the Cobra trademark on certain cordless telephone models in Central and South America. A royalty was to be paid to Dynascan through back-to-back letters of credit whereby Babbit would pay a higher unit charge to Dynascan than Dynascan would pay to the manufacturer of the cordless telephones.
 
 
 138
 In July and August, 1989, Babbit ordered and received over ten thousand cordless telephones that it attempted to sell in South America as Cobra products. Babbit, however, in violation of the terms of the Agreement, failed to notify Dynascan about the manufacture and distribution of these products, and Babbit failed to pay Dynascan the standard five percent royalty that was an integral component of the Agreement. Consequently, the Court concludes that Babbit breached its contract with Dynascan by failing to pay a royalty to Dynascan and by failing to order the SA-660s Cobra cordless telephones through Dynascan as required in the Agreement.
 
 2. Trademark Infringement
 
 139
 Dynascan's trademark infringement claim, pursuant to 15 U.S.C. Sec. 1114(1)(a),[3] rests on the notion that a particular use of a registered trademark is likely to cause confusion. In this case, the registration of the trademarks is not an issue, because Dynascan presented certificates of registration for each of the "Cobra" trademarks owned by Dynascan. The Court must therefore determine whether Babbit's use of the Cobra trademark is likely to cause confusion in the minds of potential buyers as to the source, affiliation or sponsorship of the products. Interstate Battery System v. Wright, 811 F.Supp. 237, 241 (N.D.Tex.1993).
 
 
 140
 In determining whether there is a likelihood of confusion, the Court may consider a variety of factors, including similarity of design, similarity of the products, identity of retail outlets and purchasers, similarity of advertising media, the defendant's intent and actual confusion. Jaquar [Jaguar] Cars Ltd. v. Skandrani, 771 F.Supp. 1178, 1183 (S.D.Fla.1991). Application of these elements to the facts of this case compels the conclusion that Babbit's sale of Cobra cordless telephones is likely to confuse the public into believing that Babbit's products are associated with Dynascan or that Dynascan sponsored, licensed or consented to the manufacture and sale of Babbit's products. The marks used by Babbit are identical to the Cobra trademarks owned by Dynascan, and the Model SA-660s telephones sold by Babbit containing a Cobra label are nearly identical to Dynascan's Model SA-620s cordless telephones.
 
 
 141
 In addition, although there is no evidence of actual confusion,[4] this Court has found that Babbit intentionally infringed upon Dynascan's trademark rights and intentionally breached the Agreement. "Intent to copy in itself creates a rebuttable presumption of likelihood of confusion." Bauer Lamp Co., Inc. v. Shaffer, 941 F.2d 1165, 1172 (11th Cir.1991), citing, Ambrit [AmBrit], Inc. v. Kraft, Inc., 812 F.2d 1531, 1542 (11th Cir.1986). See also First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1385 (9th Cir.1987) ("Intent of a defendant in adopting his trade dress is a critical factor, since if the trade dress were adopted with the intent of depriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity.").
 
 
 142
 In fact, a likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark. Interstate Battery System, 811 F.Supp. at 243, citing, Amstar v. Domino's Pizza, 615 F.2d 252, 263 (5th Cir.1980), cert. denied, 449 U.S. 899 [101 S.Ct. 268, 66 L.Ed.2d 129] (1980). Babbit intended to improve sales of MCE telephones by relabeling them with Cobra labels because Babbit was having difficulty selling MCE telephones. Based on the foregoing discussion, the Court concludes that there has been trademark infringement as determined by the likelihood of confusion analysis.
 
 
 143
 Babbit presents several arguments in opposition to a finding of likelihood of confusion. First, Babbit contends that there cannot be a showing of likelihood of confusion because Babbit's telephone sales did not occur in the same market as Dynascan's telephone sales. Babbit states that "when goods travel in unrelated trade channels, no likelihood of confusion exists." (D.E. # 165 at p. 34). This Court concludes, however, that "confusion, or the likelihood of confusion, not competition, is the real test of trademark infringement." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 257-58 (2nd Cir.1987). Direct competition between the parties is not a prerequisite to relief under the Lanham Act. In fact, the Court would not expect to find substantial evidence demonstrating that Dynascan was in competition with Babbit in South America because Babbit was already selling Cobra telephones in that geographic territory with Dynascan's permission. Regardless of Dynascan's activities at the time of the infringement, its name continued to be a marketable commodity and it has the right to use it on other goods or to grant such a license to other companies. Bowmar Instrument Co. v. Continental Microsystems, Inc. [497 F.Supp. 947], 208 U.S.P.Q. 496, 503 (S.D.N.Y.1980).
 
 
 144
 As a corollary to this argument, Babbit contends that United States copyright laws and the Lanham Act do not apply to Babbit's sales of cordless telephones because the sales occurred outside of the United States. This argument is not compelling because this Court has already found that Lanham Act jurisdiction exists because Babbit imported cordless telephones into the United States to a free trade zone before shipping the products to South America. (T.R. at 5). Babbit presses this argument, however, by presenting the Court with Zenger-Miller, Inc. v. Training Team, GmBH [GmBH], 757 F.Supp. 1062 (N.D.Cal.1991).
 
 
 145
 In Zenger-Miller, the court concluded that there was no subject matter jurisdiction over Lanham Act claims where all of the defendant's sales occurred in Germany. A close examination of the underlying rationale of Zenger-Miller, however, clearly supports this Court's conclusion that the Lanham Act can apply where sales occur outside of the United States. Specifically, the Zenger-Miller court found that the defendant was a foreign corporation and all negotiations leading to the contract in that case occurred abroad. In the instant case, Babbit is an American corporation, and the negotiations leading to the Agreement occurred primarily in the United States. In addition, the defendant in Zenger-Miller did not allege that any infringing activity took place in the United States. Babbit, however, imported labels and telephones into a free trade zone in the United States, and Babbit orchestrated sales from a Florida office.
 
 
 146
 In Reebok Internat'l v. American Sales Corp., 11 U.S.P.Q.2d 1229 (E.D.Wash.1989), the court upheld the invocation of Lanham Act jurisdiction where the defendant, a California corporation, imported counterfeit shoes from Taiwan to a free trade zone in Los Angeles and then exported the goods to Belgium. The court noted that "the Lanham Act imposes upon this court the duty to protect the entire gamut of purchasers, including non-English speaking purchasers, in various countries throughout the world to which the defendants intend to export their products." Id. at 1231. Consequently, this Court concludes that it has jurisdiction to address the trademark infringement counterclaim, even though Babbit's sales of cordless telephones occurred outside of the United States. See also Ocean Garden, Inc. v. Marktrade Co., Inc., 953 F.2d 500, 505 (9th Cir.1991) (Court held that "entry of infringing goods into a foreign trade zone is a sufficient act in commerce to trigger subject matter jurisdiction in federal courts under the Lanham Act.").
 
 
 147
 Babbit also argues that Dynascan has engaged in "naked licensing" and thereby forfeits all rights to the Cobra mark in the geographic and product markets where use of the mark has not been adequately protected. In this instance, there is substantial evidence that a number of counterfeiters were active in South America during the mid-1980s. "The existence of third party infringers, however, does not constitute an abandonment of a mark where the trademark owner does not consent to the use of the mark by these others but rather, vigorously pursues these third party infringers." Visa International v. Bankcard Holders of America, 211 U.S.P.Q. 28, 41 (N.D.Ca. [Cal.]1981). In addition, the party seeking to prove abandonment must prove intent to abandon on the part of the trademark owner. Id. Although Dynascan did not act with particular vigor against third party infringers in South America, failure to institute legal action against an infringer is insufficient to establish abandonment of a trademark. Playboy Enterprises v. P.K. Sorren Export Co., 546 F.Supp. 987, 996 (S.D.Fla.1982). Babbit has utterly failed to prove that Dynascan intentionally abandoned its Cobra mark or ceased use of the Cobra trademark.
 
 
 148
 Finally, Babbit argues that there is no violation of the Lanham Act because the articles that are alleged to be counterfeits are actually genuine goods, produced in the same factory as the approved Cobra telephones. It is true that the unauthorized sale of a genuine trademarked product does not in itself constitute trademark infringement, but Babbit fails to appreciate that identical goods sold in an unauthorized manner are not necessarily genuine for purposes of the Lanham Act. Hunting World, Inc. v. Reboans, Inc., 24 U.S.P.Q.2d 1844, 1849 (N.D.Ca. [Cal.]1992), citing, H.L. Hayden Co. v. Siemens Medical Systems, Inc., 879 F.2d 1005, 1023 (2nd Cir.1989). In this instance, Babbit failed to order the Model SA-660s telephones through Dynascan, and Babbit failed to submit a sample Model SA-660s telephone to Dynascan for approval. In fact, the Model SA-660s cordless telephone, originally a MCE model, is physically different from all other Cobra models. Although there is no evidence suggesting that the Model SA-660s cordless telephones are inferior to authorized Cobra products, inferiority is not a prerequisite to a finding of a Lanham Act violation. Tanning Research Lab. v. Worldwide Import and Export, 803 F.Supp. 606, 609 (E.D.N.Y.1992). "Congress hardly intended to step through the looking glass into a world in which valid trademark owners were only protected from inartful counterfeiters." Id.
 
 3. Counterfeiting
 
 149
 In order for Dynascan to prevail on its counterfeiting claim, it must demonstrate that Babbit infringed a registered trademark in violation of 15 U.S.C. Sec. 1114(1)(a), and it must prove that Babbit "intentionally used a mark, knowing such mark is a counterfeit mark." 15 U.S.C. Sec. 1117(b).[5] The Court has determined that Babbit infringed registered marks in violation of 15 U.S.C. Sec. 1114(1)(a). The Court has also found that Babbit intentionally used the marks in question. "The analysis therefore focuses on whether [Babbit] used the marks knowing that they were counterfeit."[6]
 
 
 150
 In the Agreement, Babbit and Dynascan agreed that Babbit could use the Cobra trademark in connection with the distribution and sale of certain models of cordless telephones in South America, as long as Babbit ordered the products through Dynascan. Although the models that were subject to the Agreement changed over a period of years, the ordering procedures did not change. The Agreement clearly contemplated that Babbit's right to use Dynascan's trademarks only extended to products ordered through Dynascan, not to cordless telephones ordered outside the terms of the Agreement. Babbit, however, attached Dynascan's trademarks to other cordless telephones, namely Model SA-660s telephones. Therefore, Babbit had knowledge that the telephones to which they affixed Dynascan's marks were not Dynascan's telephones and that their acts contravened the terms of the Agreement. See Interstate Battery System, 811 F.Supp. at 244 (Court held that licensee that used trademark on batteries bought from a different source than the trademark owner and in violation of a licensing agreement was a counterfeiter.). Consequently, it is clear that Babbit used Dynascan's trademarks knowing that they were counterfeit. Babbit is therefore liable for trademark counterfeiting.
 
 
 151
 4. Unfair Competition, False Designation & Dilution
 
 
 152
 Dynascan also presents an allegation of false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a), state law causes of action for dilution, pursuant to Fla.Stat. Sec. 495.151, and unfair and deceptive trade practices, pursuant to Fla.Stat. Sec. 501.204(1), and a common law cause of action for unfair competition. The same set of facts enabling Dynascan to prevail under Section 1114(a)(1) will result in recovery pursuant to Section 1125. Marathon Mfg. Co. v. Enerlite Products Corp., 767 F.2d 214, 217 (5th Cir.1985). This is because Section 1125(a) is broader than Section 1114 in that it covers false advertising or description whether or not it involves trademark infringement. Silverstar Enterprise, Inc. v. Aday [537 F.Supp. 236], 218 U.S.P.Q. 142, 146 (S.D.N.Y.1982). In addition, the analysis is the same for Dynascan's unfair competition cause of action. Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1476 (11th Cir.1991); Clairol, Inc. v. Save-Way Industries, Inc., 210 U.S.P.Q. 459, 470 (S.D.Fla.1980). This Court's analysis is therefore equally conclusive of these issues.
 
 
 153
 Finally, Dynascan is entitled to relief under the state cause of action for dilution. See Jaguar Cars Ltd. v. Skandrani, 771 F.Supp. 1178, 1185 (S.D.Fla.1991). Section 495.151 provides that any person using a mark is entitled to an injunction enjoining:
 
 
 154
 Subsequent use by another of the same or similar mark if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.
 
 
 155
 Fla.Stat. Sec. 495.151. There is a strong likelihood of dilution in the present case because purchasers may associate Babbit's telephones with Dynascan telephones.[7]
 
 C. DAMAGES AND INJUNCTIVE RELIEF
 
 156
 Dynascan argues that it is entitled to a plethora of damages pursuant to the Lanham Act, including a permanent injunction, treble damages, attorney's fees and costs, and prejudgment interest.[8] The Lanham Act provides for recovery by a successful plaintiff of: "(1) defendants profits; (2) any damages sustained by the plaintiff; and (3) the costs of this action." 15 U.S.C. Sec. 1117. This recovery is cumulative, that is, the Court may award Dynascan both its damages and Babbit's profits. Playboy Enterprises, 546 F.Supp. at 997. There are, however, different standards for the awarding of each measure of damages.
 
 1. Babbit's Profits
 
 157
 Where the defendant's infringement is deliberate and willful, as in this case, an accounting for profits is proper under a theory of unjust enrichment. Maltina Corp. v. Cawy Bottling Co. Inc., 613 F.2d 582, 585 (5th Cir.1980). This accounting serves to deter future infringement, and is thus appropriate even where the plaintiff is not in direct competition with the defendant. Id. In this instance, Babbit has demonstrated and the Court has found that Babbit's profits averaged 25% on all sales of Cobra products. Babbit's sales of infringing products to South America amounted to a total sum of $561,868.30. Babbit's profits on these sales, calculated consistent with Babbit's 25% profit margin, totaled $140,467.08.
 
 2. Dynascan's Damages
 
 158
 In order to recover damages (apart from Babbit's profits), Dynascan must demonstrate that it suffered actual damages. Id. at 587. "The mark owners royalties are normally used as the measure of damages, but the plaintiff must prove both lost sales and that the loss was caused by defendants' actions." Playboy Enterprises, 546 F.Supp. at 998. Dynascan has not demonstrated that it would have made any of the sales that Babbit has made, but the Court concludes that it has demonstrated that Babbit would have purchased authentic Cobra telephones had they not acquired the counterfeit telephones. The Court draws this conclusion because Babbit was unable to sell its MCE labelled telephones, and the sales of Cobra telephones were still highly profitable, as demonstrated by the sale of the counterfeit telephones. Thus, Dynascan is entitled to an award of damages for Babbit's failure to pay the required five percent royalty on cordless telephone sales of $561,868.30. Consequently, Dynascan is entitled to damages totalling $28,093.42.[9]
 
 3. Trebling of Damages
 
 159
 The Court may, in its discretion, reduce or enhance the resulting award up to three times the amount of profits or damages, whichever is greater, as justice shall require. 15 U.S.C. Sec. 1117(a). Such an award is discretionary, but it may not be punitive, and must be based on a showing of actual harm. Donsco, Inc. v. Casper Corp., 587 F.2d 602 (3rd Cir.1978). If the infringement is intentional, however, and the use of a counterfeit trademark has been proven, then Sec. 1117(b) governs, and the Court is required to treble damages and award attorney's fees unless the Court finds extenuating circumstances. Chanel, Inc., 931 F.2d at 1476. See also Louis Vuitton S.A. v. Lee, 875 F.2d 584, 588 (7th Cir.1989).
 
 
 160
 Dynascan has demonstrated and this Court has found that Babbit intentionally infringed the Cobra trademark and used a counterfeit Cobra trademark. Consequently, the Court finds that a trebling of damages is required. Pursuant to this conclusion, Dynascan is entitled to a trebling of Lanham Act damages from Babbit for lost profits in the amount of $421,401.24.
 
 4. Costs
 
 161
 Dynascan is entitled to recover its costs. 15 U.S.C. Sec. 1117; Fed.R.Civ.P. 54(d). Dynascan is directed to submit a bill of costs to the Court within fifteen (15) calendar days of the date of this Order.
 
 5. Attorney's Fees
 
 162
 In an exceptional case, the Court may award attorney's fees. 15 U.S.C. Sec. 1117. This is an exceptional case because Babbit intentionally arranged to obtain counterfeit goods from Hyundai, intentionally avoided contractual obligations, and intentionally passed off such goods as Cobra products. Consequently, attorney's fees are awarded to Dynascan.[10] Dynascan is directed to submit a detailed affidavit describing the work done, the time involved, and the amount claimed for each such item of work within fifteen (15) calendar days of the date of this Order.
 
 6. Prejudgment Interest
 
 163
 The Court may, in its discretion, award prejudgment interest on the total amount of the damages award. 15 U.S.C. Sec. 1117. For the reasons stated above, Dynascan is awarded prejudgment interest, beginning with the date that Dynascan filed its counterclaims, filed May 24, 1991, to the conclusion of the trial of this matter, November 13, 1992.
 
 7. Personal Guarantee of Damages Award
 
 164
 Dynascan has requested that all relief awarded in this case be applied jointly and severally to Defendants Babbit, Robert Steinmetz and Sol Steinmetz. Robert Steinmetz is President of Babbit and Sol Steinmetz is Chairman of Babbit. Both officers testified that they were personally involved in the unauthorized purchase and sale of Cobra products, even after receiving notification from Dynascan that the sale of any Model SA-660s cordless telephones was a violation of the Agreement and trademark statutes. "If an individual actively and knowingly caused the trademark infringement, he is personally responsible." Chanel, Inc., 931 F.2d at 1477. Specifically, a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil. Selchow & Righter Co. v. Goldex Corp., 612 F.Supp. 19 (S.D.Fla.1985). Neither Robert nor Sol Steinmetz submitted any evidence to contest the fact that they authorized, directed and participated in the infringement of Dynascan's trademark. See Tanning Research Lab. v. Worldwide Import & Export, 803 F.Supp. 606, 610-11 (E.D.N.Y.1992) (Court held shareholders and officers personally liable for trademark infringement where the individuals infringed trademark even after notification from the trademark owner). Consequently, Robert Steinmetz and Sol Steinmetz are jointly and personally liable for their participation in Babbit's counterfeiting activities.
 
 III. CONCLUSION
 For the preceding reasons, it is hereby
 
 165
 ORDERED AND ADJUDGED that judgment shall be entered in favor of Defendant Dynascan and against Plaintiff Babbit as to Babbit's Complaint, and in favor of Counter-plaintiff Dynascan and against Counter-defendant Babbit as to Dynascan's Counterclaim, by separate order, pursuant to Fed.R.Civ.P. 58.
 
 
 
 *
 Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 As between Dynascan and Babbit, there is no issue as to "ownership" of the "Cobra" trademark. Dynascan owned the "Cobra" trademark
 
 
 [1]
 In Count II of the Complaint, Babbit seeks a declaratory judgment concerning Babbit's obligation to pay royalties on the 1989 sale of Cobra goods to Panama. Babbit argues that the Agreement between Babbit and Dynascan should be rescinded by the Court because it was fraudulently induced by Dynascan. The Court, however, has concluded that Babbit did not prevail on its fraud action against Dynascan. Consequently, the Court denies Babbit's request for a declaratory judgment
 
 
 [2]
 The breach of contract cause of action alleged by Dynascan is set out in Count VIII of Dynascan's Counterclaim
 
 
 [3]
 Section 1114 provides, in pertinent part:
 (1) Any person who shall, without the consent of the registrant--
 (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
 (b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant.
 
 
 [4]
 "Evidence of confusion is not a prerequisite to a finding of likely confusion." Jaguar Cars Ltd., 771 F.Supp. at 1184, citing E. Remy Martin & Co. v. Shaw-Ross Internat'l Imports, Inc., 756 F.2d 1525, 1529 (11th Cir.1985)
 
 
 [5]
 Section 1117 provides, in pertinent part:
 (b) Treble damages for use of counterfeit mark
 In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title or section 380 of Title 36 that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services.
 
 
 [6]
 A "counterfeit" mark means "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. Sec. 1127
 
 
 [7]
 The Court agrees with Babbit that Fla.Stat. Sec. 501.201-213 only provides remedies for consumer transactions and has no application to this cause of action. Bryant Heating & Air Conditioning v. Carrier Corp., 597 F.Supp. 1045, 1053 (S.D.Fla.1984)
 The Court also notes that Dynascan has presented no case law, nor can the Court find any case law, suggesting that the Tariff Act of 1930, 19 U.S.C. Sec. 1526, applies to a standard trademark infringement case. Although the plain language of the Tariff Act suggests that a party may not import trademarked merchandise into the United States without the consent of the trademark owner, this Court concludes that "there is no evidence that Congress intended such a sweeping scope to Sec. 1526(a)." See Vivitar Corp. v. United States, 595 F.Supp. 420, 435 (Ct.Int'l.Trade 1984) (Court held that "construing Sec. 1526 to apply when a foreign source of imports is related to, or the agent of, the American trademark owner could lead to results that Congress could not reasonably have intended when it enacted the section.").
 
 
 [8]
 Babbit's sales of Model SA-660s cordless telephones bearing a Cobra trademark have infringed Dynascan's trademark registrations in violation of the Lanham Act, 15 U.S.C. Sec. 1114(1) and 15 U.S.C. Sec. 1125(a). Consequently, Dynascan is entitled to an injunction enjoining Babbit and its corporated affiliates and subsidiaries, officers, agents, servants, employees, attorneys and those in active concert and participation with them from the unauthorized use or employment in connection with buying, advertising, promoting, displaying, offering for sale or distributing of goods or merchandise containing or having attached or having in association therewith Dynascan's Cobra trademarks and trade name or colorable imitations thereof and specifically including cordless telephones manufactured by Hyundai or any related companies. 15 U.S.C. Sec. 1116(a). See Jaguar Cars, Ltd., 771 F.Supp. at 1185
 
 
 [9]
 Dynascan is also entitled to damages in the form of lost royalties pursuant to Babbit's breach of contract
 
 
 [10]
 The Court notes that Dynascan is also entitled to attorney's fees pursuant to the Agreement. Specifically, Babbit's breach of the Agreement entitles Dynascan to attorney's fees pursuant to the personal guarantees executed by Robert and Sol Steinmetz in connection with the Agreement