197 F.Supp.2d 1197 (2002)
COUNCIL OF BETTER BUSINESS BUREAUS, INC., et al., Plaintiffs,
v.
BAILEY & ASSOCIATES, INC., d/b/a New Horizons, d/b/a National Resorts, d/b/a National Acceptance Corp., et al., Defendants.
No. 4:00-CV-1236 CAS.
United States District Court, E.D. Missouri, Eastern Division.
March 29, 2002.
*1198 *1199 *1200 Frank B. Janoski, Partner, Joseph E. Martineau, Maureen C. Beekley, Lewis and Rice, St. Louis, MO, for Plaintiffs.
*1201 John T. Walsh, Abigail T. Kelman, Nicole L. Morris, Erin M. Matis, Gallop and Johnson, Clayton, MO, for Defendants.

MEMORANDUM AND ORDER
SHAW, District Judge.
This is an action by plaintiffs Council of Better Business Bureaus, Inc. ("CBBB") and Better Business Bureau of St. Louis, Inc. ("BBB"), asserting trademark infringement and counterfeiting under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Count I); unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count II); dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (Count III); and Missouri common law trademark infringement (Count IV). The CBBB and BBB are collectively referred to as "plaintiffs." Plaintiffs seek monetary and injunctive relief. The defendants are Bailey & Associates, Inc., Winner's Circle of Chicago, Inc., William Bailey, Jeffrey Anthony D'Amato, Debra Lynn D'Amato and Robert Williams (collectively "defendants").
The matter is before the Court on plaintiff CBBB's motion for partial summary judgment on Count I. CBBB asserts it is entitled to judgment as a matter of law on its claims that (1) defendants have infringed CBBB's registered service trademarks in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) defendants have counterfeited CBBB's registered service trademarks in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); and (3) CBBB is entitled to recover, at its election any time before final judgment herein, statutory damages as provided under Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), in lieu of defendants' profits or CBBB's actual losses resulting from the infringing activity. Defendants oppose the motion.
For the following reasons, the Court will grant in part and deny in part CBBB's motion for partial summary judgment.

Background.
The CBBB is a not-for-profit corporation, and is the owner and registrant of certain federally-registered service trademarks. The CBBB establishes general policies under which member Better Business Bureaus ("member BBBs"), including plaintiff BBB, are licensed to use the trademarks in exclusive geographical territories throughout the United States.
Among the activities of member BBBs, including plaintiff BBB, is the compilation and reporting of business complaint history. Consumers can complain to a member BBB about the advertising, sales practices, services or products of a business. The member BBB records information about the complaint, notifies the business and requests a response. Sometimes the response resolves the complaint. Sometimes no resolution is reached. A summary of this information is compiled in the BBB's reliability report ("BBB report") on the business, which is then made available to consumers considering a transaction with the business.
The Amended Complaint alleges that as early as 1995, defendants used documents bearing the BBB torch logo and a "Better Business Bureau Report" caption in connection with sales of New Horizons travel club memberships. Plaintiffs allege that these documents purported to be copies of the BBB Report for the New Horizons travel club, a name under which defendant Bailey & Associates, Inc. does business, but in fact the documents were not generated or approved by the CBBB, the registered owner of the Marks at issue, or any of its licensees. Plaintiffs assert that defendants were not entitled to use the Marks in these documents or in any other way, and had no reason to believe they *1202 were so authorized. In addition, plaintiffs assert that the documents were not accurate reproductions of genuine BBB reports about New Horizons, but rather in many respects were falsifications of genuine BBB reports and were counterfeit.
Plaintiffs allege that although defendants knew these documents were counterfeit, they and their agents periodically created, modified, reproduced and distributed the documents and included within them information they knew was not included in genuine BBB reports. Plaintiffs allege that defendants exploited the Marks in connection with the sale of their travel-related services, sometimes as a precursor and inducement for a sale, and other times after a sale, presumably to make the customer comfortable with the purchase and to safeguard against the customer checking with the BBB and obtaining a genuine report on New Horizons. Plaintiffs also allege that as early as August 1997, defendant William Bailey, president of Bailey & Associates, Inc., learned about the counterfeit documents, but the practice of displaying the documents to consumers continued through at least 1999.

Summary Judgment Standard.
The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir.1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); Herring v. Canada Life Assurance Co., 207 F.3d 1026, 1029 (8th Cir.2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir.), cert. denied, 528 U.S. 1063, 120 S.Ct. 618, 145 L.Ed.2d 512 (1999). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson, 477 U.S. at 248, 106 S.Ct. 2505).
In reviewing a motion for summary judgment, this Court is required to view the facts in a light most favorable to the non-moving party and to give the non-moving party the benefit of any inferences that can logically be drawn from those facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, this Court is required to resolve all conflicts in favor of the non-moving party. Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). Nonetheless, "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir.1993).

Facts.
With the foregoing standards in mind, the Court finds the following facts for purposes *1203 of the instant motion for partial summary judgment:[1]
1. CBBB is the owner and registrant of certain proprietary and federally registered service trademarks (the "Marks"), including the following:
 BETTER BUSINESS BUREAU Registration Numbers 566,415 (Registration Year 1952) and 971,579 (Registration Year 1973) (Both for: "Investigative and information services relative to business and trade practices for protecting responsible business against abusive business practices and for establishing and maintaining legitimate advertising and merchandising practices...."), and 969,847 (Registration Year 1973) (For: "Indicating membership in applicant. ...")
 BBBRegistration Number 2,314,197 (Registration Year 2000) (For: "Investigative and information services relative to business and trade practices for protecting responsible business and the public against abusive business practices and for establishing and maintaining legitimate advertising and merchandising practices....")
 BBBRegistration Number 2,314,197 (Registration Year 2000) (For: "Investigative and information services relative to business and trade practices for protecting responsible business and the public against abusive business practices and for establishing and maintaining legitimate advertising and merchandising practices....")
 BBB Torch LogoRegistration Number 749,915 (Registration Year 1963) (For "Investigative and information services relative to business and trade practices for protecting responsible business and the public against abusive business practices and for establishing and maintaining legitimate advertising and merchandising practices. ...")
 Composite mark of the words "Better Business Bureau" in a semi circle above the Torch LogoRegistration Numbers 1,841,476 (Registration Year *1204 1994) and 2,073,514 (Registration Year 1997) (Both for: "Investigative and information services relative to business and trade practices for protecting responsible business and the public against abusive business practices and for establishing and maintaining legitimate advertising and merchandising practices....")
(Certified copies of CBBB trademarks Appendix Tab 1; Affidavit of Ronald Berry ¶ 2Appendix Tab 2). The Marks are in full force and effect, unrevoked and uncanceled. (Id.)
2. The CBBB establishes general policies under which member BBBs, including plaintiff the St. Louis BBB, are licensed to use the Marks in exclusive geographical territories throughout the United States. The CBBB and its predecessors have continuously and extensively used the Marks for many years. (Affidavit of Ronald Berry ¶¶ 3-4Appendix Tab 2).
3. Among the activities performed by member BBBs is the compilation and reporting of business complaint history. Consumers can complain to a member BBB about the advertising, sales practices, services or products of a business. The member BBB records information about the complaint, notifies the business and requests a response. Sometimes the response resolves the complaint (e.g., "we will replace it;" "we will refund the customer's money"). Sometimes no resolution is reached. A summary of this complaint information is compiled in BBB reliability reports ("BBB reports") on the business, which is then made available to consumers considering a transaction with the business. (Affidavit of Ronald Berry ¶ 5Appendix Tab 2).
4. Consumers who telephone a member BBB can obtain BBB reports about a business read by a live operator or through a voice-activated recording, facsimile or mail. BBB reports are also available on the internet. BBB reports generally identify, inter alia, the principals of the business, the date it started business, the date the BBB opened a file on the business, whether the business is a BBB member, and either a summary of the company's complaint history or the total number of complaints resolved, disputed and not responded to for the last three calendar years. (Affidavit of Ronald Berry ¶ 6Appendix Tab 2). A business with an exceptionally large number of complaints, with a particular pattern of complaints or having regulatory action taken against it can have a customized report that will identify further information about the business. Defendant Bailey & Associates, Inc. has had a customized BBB report for years. (Michelle Corey Dep. p. 65Appendix Tab 3).
5. The consuming public recognizes the Better Business Bureau name and Marks, and many consumers rely upon and trust the information obtained in BBB reports when making purchases. (Michelle Corey Dep. pp. 98-99Appendix Tab 3; Affidavit of Ronald Berry ¶ 7Appendix Tab 2).

The Defendants
6. Defendant Bailey & Associates, Inc. is an Illinois corporation. Over the years, it has operated under a variety of subsidiary companies and fictitiously named businesses, including defendant Winner's Circle of Chicago, Inc. and New Horizons (collectively "Bailey & Associates"). (First Amended Complaint, hereinafter "Complaint," and Answer to First Amended Complaint, herein after "Answer," ¶¶ 6-7 Appendix Tab 4).
7. In one form or another, the business of the defendant entities has been the sales of memberships in purported discount vacation and travel-related services. To generate sales of these memberships, defendants conduct promotional sweep-stakes or prize giveaways using forms completed by or mailed to consumers, *1205 send direct mail solicitations to consumers, target telephone solicitations to consumers and conduct membership sales meetings with consumers. In the early 90s, Bailey & Associates began operations under the name New Horizons. At various times, New Horizons has had sales offices in St. Louis, Kansas City, Detroit, Indianapolis and Chicago. New Horizons sells memberships ("Memberships"). Defendants represent that these Memberships provide discounts to hotels, resorts, condominiums, airfares, auto rentals, etc. Memberships in New Horizons differ in price and length, but consumers often pay an initial fee ranging from $3000 to $5000, with an additional yearly "maintenance" fee of approximately $110 per year. (Complaint and Answer, ¶¶ 24, 25 and 28Appendix Tab 4). Memberships range from a period of years, to a generation, to multiple generations. (Debra D'Amato Dep. pp. 12-13 Appendix Tab 5).
8. Defendant William Bailey is the owner and President of Bailey & Associates, and he has overall responsibility for the New Horizons offices in Michigan, Kansas City, Indianapolis and St. Louis. (Complaint and Answer, ¶ 8Appendix Tab 4; Jeffrey D'Amato Dep. pp. 15-16 Appendix Tab 6; Bailey Dep. pp. 14-15 Defs.' Appendix Tab A). Defendant Jeffrey D'Amato is the Vice President of Sales for New Horizons, reporting directly to Bailey. Jeffrey D'Amato is in charge of all sales for New Horizons and has day-to-day oversight of the New Horizons offices. (Complaint and Answer, ¶ 8Appendix Tab 4; Jeffrey D'Amato Dep. pp. 12, 15-16 Appendix Tab 6; Bailey Dep. pp. 14-15 Defs.' Appendix Tab A; Partial Trial Transcript of Testimony of Jeff D'Amato in Winner's Circle of Chicago, et al. v. Sabrina Goding, et al., case no. 99 AC 5540, St. Louis County Circuit Court, pp. 3-4Defs.' Appendix Tab B). Defendant Debra D'Amato is Jeffrey D'Amato's wife and the General Manager of New Horizons' St. Louis office, reporting to Jeffrey D'Amato. (Debra D'Amato Dep. pp. 5, 13-15 Appendix Tab 5). Until approximately August 1998, defendant Robert Williams was the Member Services Director of New Horizons' St. Louis office, reporting to Debra D'Amato, and he is now the General Manager of the Detroit office, reporting to Jeffrey D'Amato and William Bailey. (Williams Dep. p. 12Appendix Tab 7).

Defendants' Use of Spurious BBB Reports
9. Beginning at least as early as 1995, agents of Bailey & Associates used documents containing the Better Business Bureau name and logos which contained copies of the Marks or marks similar to and substantially indistinguishable from the Marks. New Horizons' sales representatives represented that such documents came from the Better Business Bureau. Many consumers who were shown the documents believed based on their appearance or based on representations regarding them that they were issued by the Better Business Bureau, including but not limited to the following:
 In spring 1995, Sandra Wood and her husband attended a New Horizons sales presentation and purchased a Membership after a New Horizons sales representative showed them a document purporting to be a BBB report stating that there were no BBB complaints against New Horizons. New Horizons represented that the source of that document was the Better Business Bureau. The Woods remained of that belief until a court dispute over the validity of the Membership contract in 1997. (Sandra Wood Dep. pp. 8, 14-16, 21-22Appendix Tab 8).
 On November 7, 1997, Robert Crawford and his wife attended a New Horizons sales presentation and purchased *1206 a Membership after a New Horizons sales representative showed them a document containing the letterhead of the Better Business Bureau of St. Louis, which stated that New Horizons had been the subject of only one resolved complaint with the BBB. New Horizons represented that the source of that document was the Better Business Bureau. As a consequence of being shown this document, Mr. Crawford refrained from calling the BBB, which he otherwise would have done. Mr. Crawford believed that the document was from the BBB until calling the BBB later to complain about his dissatisfaction with the services and discounts provided by New Horizons. (Robert Crawford Dep. pp. 9, 12-16, 29Appendix Tab 9).
 On January 15, 1998, Monica and Steven Kentch attended a New Horizons sales presentation and purchased a Membership after a New Horizons sales representative showed them a piece of paper having a BBB logo and told them that New Horizons was in good standing with the BBB. (Monica Kentch Dep. in Winner's Circle, et al. v. Monica Kentch, et al., case no. 99 AC 007397, Associate Circuit Court for St. Louis County, pp. 16-17, 28-40 Appendix Tab 10).
 On August 27, 1998, William and Dori Freelain attended a New Horizons sales presentation and purchased a Membership after a New Horizons sales representative showed them a piece of paper having a BBB logo and told them that New Horizons was in good standing with the BBB and that there were no complaints filed by New Horizons' members with the BBB. (William Freelain Dep. in Winner's Circle, et al. v. Monica Kentch, et al., case no. 99 AC 007397, Associate Circuit Court for St. Louis County, pp. 12, 93-98Appendix Tab 11; Dori Freelain Dep. pp. 40-43Appendix Tab 12).
 On August 28, 1999, Mary Preston and her husband attended a New Horizons sales presentation and purchased a Membership after a New Horizons sales representative showed them a letter purportedly from the Better Business Bureau, containing its name and stating that there were no BBB complaints against New Horizons. New Horizons represented that the source of that document was the Better Business Bureau. The Prestons believed that the document came from the BBB until calling the St. Louis BBB approximately 1½ years later to register a complaint about New Horizons. (Mary Preston Dep. pp. 8, 11, 14-16, 18, 31Appendix Tab 13).
 On October 14, 1999, Clarence Christianell and his wife attended a New Horizons sales presentation and purchased a Membership after a New Horizons sales representative showed them a document containing the BBB name and logo, and stated to them something to the effect of "we are backed by the Better Business Bureau." (Clarence Christianell Dep. pp. 7, 13-17Appendix Tab 14).
 On July 1, 2000, Christy Parker and her husband attended a New Horizons sales presentation and purchased a Membership after a New Horizons sales representative showed them a document containing the BBB name and logo. They believed that the source of the document was the Better Business Bureau. Three weeks later, they learned that the document did not come from the Better Business Bureau after a competitor of Bailey & Associates advised them about a consumer fraud lawsuit brought by the Missouri Attorney General. (Verified Statement *1207 of Christy Parker dated April 9, 2001Appendix Tab 15).
 On October 25, 2000, Carolyn and Jeff Miller visited the Indianapolis office of New Horizons. Carolyn Miller asked whether New Horizons was a member of the Better Business Bureau. Jason, a New Horizons sales representative, told them that it was. He also showed them a document dated September 1999, which he represented to have come from the BBB and which contained what appeared to them to be a BBB logo. The document stated that there were no BBB complaints against New Horizons by persons who had purchased Memberships. (Carolyn Miller Dep., pp. 8, 10, 13-17, 26-30 Appendix Tab 16). The Millers did not purchase a Membership because they determined through checking with the BBB that the document shown to them was false. (Id. pp. 30-40).
To this point, plaintiffs have identified at least 56 consumers who have reported in one fashion or another being shown a document or object bearing the Better Business Bureau name or the Marks. (See Plaintiff BBB's Responses to First Interrogatory # 2 and First to Fifth Supplemental Responses to sameAppendix Tabs 17, 18, 19, 20, 21 and 22). Some of these consumers have submitted written complaints to the St. Louis BBB or the Missouri Attorney General identifying the misuse of the BBB name or logo. (Copies of BBB and Missouri A.G. Complaints Appendix Tab 50).
10. In September 1999, plaintiff St. Louis BBB obtained from Robert Swearingen, an attorney representing Carmen Roker, a former employee of defendants, two variants of a document bearing the Better Business Bureau name and the Marks, which documents purport to be Better Business Bureau Reports as of August 31, 1996 and September 1, 1997. (Robert Swearingen Dep. pp. 18-21, 32-35 Appendix Tab 23; Exhibits 1 and 2 to Robert Swearingen Dep.Appendix Tabs 24 and 25; Michelle Corey Dep. pp. 84-85 Appendix Tab 3). Copies of these documents are attached to the First Amended Complaint as Exhibits 3 and 4. (Michelle Corey Dep. pp. 84-85Appendix Tab 3). According to Swearingen, these documents were obtained by him from Ms. Roker, and they are substantially similar (except for date) to the document a New Horizons sales representative showed to Sandra Wood in 1995 (see ¶ 9 above). (Robert Swearingen Dep. pp. 23-24Appendix Tab 23).
11. The documents purporting to be BBB reports as of August 31, 1996 and September 1, 1997 were not generated or created by the St. Louis BBB, the CBBB or any Member BBB. (Michelle Corey Dep. pp. 84-87, 89Appendix Tab 3; Affidavit of Ronald Berry ¶ 8Appendix Tab 2). Hereinafter, such documents will be referred to as the spurious BBB reports to distinguish them from genuine BBB reports.
12. Carmen Roker has testified that she was employed as a Finance Manager and then Member Services Director for New Horizons and that she used the spurious BBB reports, with the knowledge of defendants Jeffrey D'Amato and Debra D'Amato, to induce consumers to purchase Memberships. (Carmen Roker Dep. in Alecia Hammonds, et al. v. Bailey & Associates, et al., case no. 99 CC 3329, Div. 14, St. Louis County Court, pp. 153-61 Appendix Tab 26).
13. The spurious BBB reports contain information that was either false or inconsistent with information that the CBBB or the St. Louis BBB would report. Among the falsehoods and the inconsistencies between *1208 an authentic BBB report and the spurious BBB reports are the following:
 The BBB has never numerically classified or compared complaints against Bailey & Associates on the basis of member vs. non-member or marketing practices vs. product quality. (Response of the St. Louis BBB to Defendants' First Interrogatories, # 3Appendix Tab 17)
 The statement categorizing the basis for complaints to the BBB as related strictly to marketing of gifts is false. Not only does the BBB not report such information, the basis for complaints against New Horizons was not limited to the marketing of gifts. (Michelle Corey Dep. p. 104Appendix Tab 3; Response of the St. Louis BBB to Defendants' First Interrogatories, # 3Appendix Tab 17).
 The "no member complaints" statement was false. (Michelle Corey Dep. pp. 109-111Appendix Tab 3). Review of BBB complaints against Bailey & Associates shows that during the period between 1994 through 1997, the St. Louis BBB had received approximately 67 complaints from persons who said that they had purchased Memberships. (Response of the St. Louis BBB to Defendants' First Interrogatories, # 3Appendix Tab 17). In fact, the corporate defendants and Bailey have admitted that as early as 1994 they "received correspondence from the St. Louis BBB which purported to reflect complaints from people who had purchased memberships." (Defendants' Response to Requests for Admission, ## 62 and 68Appendix Tabs 27 and 28).
 The BBB does not provide complaint ratios for the businesses it reports on such as the purported 1/100 of 1% for Bailey & Associates as stated in the spurious BBB reports. (Response of the St. Louis BBB to Defendants' First Interrogatories, # 3 Appendix Tab 17).
 The BBB does not calculate and does not report the average number of complaints on all businesses in St. Louis as stated in the spurious reports. Further, the average number of complaints per business is not 18% as set forth in those documents. (Michelle Corey Dep. p. 106Appendix Tab 3; Response of the St. Louis BBB to Defendants' First Interrogatories, # 3Appendix Tab 17).
14. Although the spurious BBB reports were not generated by the CBBB, the St. Louis BBB or any Member BBB (Affidavit of Ronald Berry ¶ 8Appendix Tab 2; Michelle Corey Dep. pp. 84-87, 89Appendix Tab 3), on their face they contain the Marks or marks very similar to the Marks. (Appendix Tabs 24 and 25). Further, on their face, the spurious reports purport to be Better Business Bureau reports. (Id.)
15. Defendant Williams told consumers that the spurious BBB reports or documents similar to them were issued by the Better Business Bureau. On January 15, 1998, during a sales presentation to Monica Kentch and her husband, defendant Williams displayed a spurious report and stated:
Oh, let me show you our Better Business Bureau report before you go.... They put this out every couple of months.... This is what you want to look at here. Complaints about New Horizon, like you guys, members nothing. 14 years, 50,000 people. You done the right thing.
(Audio cassette tape produced in discovery and transcript thereofAppendix Tab 29).
16. In responding to discovery requests, defendants state that they are unable to identify which consumers were shown the spurious BBB reports. They *1209 have acknowledged, however, that certain New Horizons employees showed the spurious reports and documents substantially similar to them to consumers in 1995, 1996, 1997, 1998 and 1999 as part of the process of selling Memberships. Specifically,
 Defendant Williams showed documents similar to the spurious reports to consumers beginning in 1997 when he started working in New Horizons' St. Louis office. He said such documents were already being used at that time. He said he continued to use the reports until leaving St. Louis in August 1998. He "cannot possibly recall who [he] showed the reports to." (Defendant Robert Williams' Responses to Second InterrogatoriesAppendix Tab 30). He cannot even provide a "ballpark figure" regarding how frequently he showed the spurious reports to consumers. (Robert Williams Dep. p. 48Appendix Tab 7).
 Jeffrey D'Amato has acknowledged that New Horizons representatives used the spurious reports from 1995 to 1997, that the reports were updated weekly after calls to the BBB, and that the old reports were regularly discarded. Like Williams, he states that he "cannot possibly recall who the reports were shown to." (Defendant Jeffrey D'Amato's Responses to Second Interrogatories Appendix Tab 31).
 Debra D'Amato has acknowledged that Robert Williams used the spurious reports in 1997 and that she has "heard that Gale Uzelac [a New Horizons salesman] used the reports in St. Louis until about 1999." She too does "not know who the reports were shown to," but "understand[s] that sales representatives would show the reports to customers after they purchased their memberships if they asked about our standing with the Better Business Bureau." (Defendant Debra D'Amato's Responses to Second Interrogatories Appendix Tab 32).
17. In other civil proceedings brought by consumers, Jeffrey D'Amato has testified that some information in the spurious reportsincluding certain explanations of the numberswas placed in the documents by New Horizons; that he knew about the use of the spurious reports, that his wife Debra "most likely" knew about such use; and that the spurious reports were used many times over many years. (Partial Trial Transcript of Testimony of Jeffrey D'Amato in Winner's Circle of Chicago, et al. v. Sabrina Goding, et al., case no. 99 AC 5540, St. Louis County Circuit Court, pp. 61-62, 110-12Appendix Tab 33). In those same proceedings, defendant Williams testified that he used the spurious reports as often as he remembered to do it. (Partial Trial Transcript of Testimony of Robert Williams in Winner's Circle of Chicago, et al. v. Sabrina Goding, et al., case no. 99 AC 5540, St. Louis County Circuit Court, pp. 50-54Appendix Tab 34).
18. In August 1997, as part of court proceedings involving his clients, the Woods, attorney Robert Swearingen presented Michael White, the Vice President, corporate secretary and corporate counsel of Bailey & Associates, and Ronald Lowery, Bailey & Associates counsel, with a spurious BBB report which had been provided to the Woods at a New Horizons sales presentation in 1995 (see ¶ 9 above). Swearingen told White and Lowery the document had been used to induce his clients to purchase a Membership, and had been represented to his clients as a genuine Better Business Bureau report, but was actually a "bogus" document. Swearingen testified the document also contained false statements, such as that New Horizons had no customer complaints. (Robert Swearingen Dep. pp. 58-62Appendix *1210 Tab 23; Affidavit of Robert Swearingen Appendix Tab 35).
19. Defendant William Bailey admits that he knew about the use of the spurious BBB reports in 1997. (Amendment of William Bailey to Responses to Plaintiff's Second Interrogatories 6/5/01Appendix Tab 36). Initially, defendant Bailey and all the other defendants submitted interrogatory responses stating that they had never "utilized in conjunction with any sale or prospective sale of any Membership" or "displayed at any location at which it sells or promotes the sale of Memberships" "any document and/or other tangible thing" containing a BBB Mark or name, logo, or mark similar to the Marks. (Defendants' Responses to First Interrogatories, ##3 and 4Appendix Tabs 37, 38, 39, 40, 41 and 42). In response to a second set of interrogatories, the defendants admitted use and/or knowledge of the spurious reports. (Appendix Tabs 43, 44, 45, 46, 47 and 48) (see also ¶ 16 above). In those responses, William Bailey asserted that his first knowledge of the spurious reports occurred in 1999. (Appendix Tab 43). Approximately six months later, after the May 30, 2001 filing of the Affidavit of Robert Swearingen detailing his 1997 statements to corporate counsel about the use of the spurious report (see ¶ 18 above; see also Swearingen AffidavitAppendix Tab 35), Bailey amended his answer, acknowledging that he was told about the spurious report in 1997. (Amendment of William Bailey to Responses to Plaintiff's Second Interrogatories 6/5/01Appendix Tab 36).
20. Defendant Debra D'Amato has testified that she did not believe the spurious BBB reports had been generated by the Better Business Bureau, and no one told her the documents were generated by the Better Business Bureau. D'Amato knew the spurious BBB reports had been used in some manner as part of the "button-up procedure" in selling Memberships. (Debra D'Amato Dep. pp. 26, 28Appendix Tab 5).
21. According to defendant Debra D'Amato, someone at Bailey & Associates, either Jeffrey D'Amato or William Bailey, instructed her to stop using the spurious reports sometime within the year prior to February 2001. (Debra D'Amato Dep. pp. 52-53Appendix Tab 5).
22. According to defendant Williams, he did not know of anyone in New Horizons' St. Louis office being told not to use the spurious reports or documents similar to them at any time while Williams was at the St. Louis office through August 1998. (Robert Williams Dep. pp. 44-45Appendix Tab 7). Williams cannot remember the exact date that any directives came down to cease using such documents, but he knows it happened while he was in Michigan, after he left the St. Louis office. (Id. p. 54). He is not aware of any written directive to stop using such materials. (Id.)
23. According to the deposition testimony of William Bailey, in July or August 1999, after a deposition of his in which the subject of the spurious BBB reports was raised, he gave "marching orders" to Jeffrey D'Amato to see to it that no such documents were currently still being used in the company. (William Bailey Dep. p. 39Appendix Tab 49). Bailey gave similar instructions to all the project directors during a conference call. (Id. p. 47). Those instructions were never memorialized in writing. (Id. p. 49).
24. None of the defendants have ever been granted any license, authorization, permission or consent to use the Marks, nor did they have reason to believe they were licensed, authorized or permitted to use the Marks. (Complaint and Answer, ¶ 21Appendix Tab 4; Affidavit of Ronald Berry ¶ 9Appendix Tab 2).

*1211 Discussion.

A. Trademark Infringement; ¶ 32(1) of Lanham Act.
CBBB moves for summary judgment against defendants on the issue of trademark infringement, asserting that the undisputed facts show that defendants used CBBB's registered service marks in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).
The Lanham Act provides that a person who uses, in commerce, any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale [or] offer of sale ... of any goods or services" without consent of the registrant and in a manner likely to cause confusion is civilly liable to the registrant. 15 U.S.C. § 1114(1). CBBB argues it is entitled to summary judgment because (1) it is the registrant of the Marks; (2) defendants used the Marks without authorization; (3) defendants used the Marks in commerce; (4) defendants used the Marks in connection with the sale of goods and services; and (5) defendants used the Marks in a manner that was likely to and did cause confusion.
"When ... a trademark dispute centers on the proper interpretation to be given to the facts, rather than on the facts themselves, summary disposition is appropriate." Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1099 (8th Cir. 1996) (citation omitted). To defeat summary judgment in a Lanham Act case alleging a violation of section 32, defendants "must raise a genuine issue of fact as to (1) whether their use of the trademark was without the registered owner's consent, or (2) whether their unauthorized use was likely to cause confusion in the marketplace as to the origin or sponsorship of the product." Microsoft Corp. v. Compusource Distributors, Inc., 115 F.Supp.2d 800, 805 (E.D.Mich.2000).

1. Ownership of the Marks.
CBBB is the owner and registrant of certain service trademarks, including the name "Better Business Bureau," the letters "BBB" and the BBB torch logo (the "Marks"). The registrations for the Marks are in full force and effect. Under the Lanham Act, the registrations are prima facie evidence of the validity and subsistence of the Marks and the CBBB's exclusive right to use them in commerce. See 15 U.S.C. §§ 1057(b), 1115(a); see also Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 869 (8th Cir.1994) (registration creates a rebuttable presumption that a mark is valid). In addition, some of the Marks are incontestable by virtue of continuous use for more than five years. See 15 U.S.C. § 1065. Defendants do not attempt to challenge CBBB's status as the owner and registrant of the Marks in their opposition memorandum or in their Response to CBBB's Statement of Facts, but denied the CBBB's registration and ownership in their Answer and objected to requests to admit the same. These denials are insufficient to create a material issue of fact in light of the registration documents and affidavit included in CBBB's Appendix at Tabs 1 and 2.

2. Use of the Marks Without Authorization.
CBBB did not consent to the defendants' use of the Marks, and defendants had no reason to believe otherwise. In addition, defendants had no lawful right to use a document that appeared to be a BBB report, to represent it as such when it was not, or to replicate BBB reports in an altered fashion. See, e.g., Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503-04 (8th Cir.1987) (citing cases). While a registered mark may be used to truthfully explain a product or service, it cannot be used if it is likely to *1212 cause confusion or mistake or to deceive. Id. Defendants do not attempt to establish that CBBB consented to their use of the Marks.

3. Use of the Marks in Commerce.
The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. "[A] mark shall be deemed to be used in commerce ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State...." Id. The Supreme Court has characterized the "in commerce" requirement as broad and with a "sweeping reach." Steele v. Bulova Watch Co., 344 U.S. 280, 283-84, 73 S.Ct. 252, 97 L.Ed. 319 (1952); 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:57 (4th ed. 2001) ("It is difficult to conceive of an act of infringement which is not `in commerce' in the sense of modem decisions.")
The undisputed facts show that defendants used the Marks "in commerce" in connection with the sale of their travel-related services because defendants' use of the Marks has occurred, at minimum, in Missouri and Indiana. See 15 U.S.C. § 1127; see also Hallmark Cards, Inc. v. Hallmark Dodge, Inc., 634 F.Supp. 990, 998 (W.D.Mo.1986). Even local, intrastate acts of infringement are "in commerce" where the acts have a substantial effect on interstate commerce. Lyon v. Quality Courts United, Inc., 249 F.2d 790, 795 (6th Cir.1957). A substantial effect on interstate commerce can be found from local acts of infringement, as these tend to jeopardize the good name of the plaintiff's product, or diminish the registrant's ability to control and sustain its registration. See Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 120 (9th Cir.), cert. denied, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968); accord Coca-Cola Co. v. Stewart, 621 F.2d 287, 290 (8th Cir. 1980).
Defendants' assertion that CBBB has failed to state that the spurious BBB reports were used by defendants in commerce is without merit, and does not raise a genuine issue of material fact.

4. Use of the Marks in Connection with Sale of Goods or Services.
The undisputed facts show that defendants used the Marks to promote the sale of their travel club Memberships. In most instances, the defendants used the Marks as precursor and an inducement for a sale, using the Marks to invoke customer confidence and to support representations such as that New Horizons had no or few customer complaints with the BBB, was a BBB member, was in good standing with or was backed by the BBB. In other instances, defendants used the marks just after a sale, presumably to make the customer comfortable with the purchase or in an effort to prevent the customer from personally checking with the Better Business Bureau.
The uncontroverted facts show that defendant Robert Williams used the spurious BBB reports. Defendant Debra D'Amato was head of the St. Louis office of New Horizons and knew about use of the spurious BBB reports, Defendant Jeffrey D'Amato, Vice President of Sales for New Horizons, knew about and encouraged use of the spurious BBB reports. He also knew the documents contained "explanations" that were not in genuine BBB reports. Defendant William Bailey, owner and President of Bailey & Associates, who had overall responsibility for New Horizons sales offices, knew about use of the spurious BBB reports in 1997, but did nothing about it until July or August 1999.
*1213 Defendants' response is to assert that CBBB "failed to actually state that Defendants used the CBBB's marks in connection with the sale or offered [sic] for sale of goods or services. Instead, Plaintiff uses words like `promote' and `inducement.'" Defs.' Mem.Opp. at 4. Defendants assert that CBBB "offers no uncontroverted facts that will fit within the requirements of a trademark infringement case, namely that Defendants used Plaintiff's Marks for the sale of goods that the BBB would otherwise have made." Id. Defendants's first assertion is merely a matter of semantics; their second assertion is devoid of citation to supporting legal authority. Defendants do not dispute their use of the Marks, and in fact state, "While it may be that the evidence will show Defendants used CBBB's Marks in a way that CBBB did not approve, this does not amount to trademark infringement." Id.
The Lanham Act has a broad reach, applying to many species of infringement and unfair competition:
The Lanham Act imposes liability for infringement of a registered mark upon any person who uses an infringing mark in interstate commerce in connection with the sale or advertising of goods or services. This broad definition includes any manufacturer, supplier, dealer, printer, publisher or broadcaster who in fact has used the infringing mark in connection with "the sale, offering for sale, distribution or advertising of any goods or services" when such use is likely to cause confusion.
This means that merely advertising an infringing mark itself is an act of infringement, apart from any manufacturing or sale.
McCarthy, supra, § 25:26.
The Lanham Act does not limit a claim of trademark infringement to situations in which the registrant and the alleged infringer compete in the marketplace. As McCarthy has explained, "The vast majority of modem decisions have adopted the rule that competition is not necessary between parties for there to be a likelihood of confusion. Confusion, or the likelihood of confusion, not competition, is the real test of trademark infringement." McCarthy, supra, § 24:13. "[T]he absence of direct competition between the goods or services of the parties is no obstacle to a finding of trademark infringement or unfair competition." Id. § 24:14. The Eighth Circuit has stated that "[c]onfusion ... may exist in the absence of direct competition." Anheuser-Busch, Inc. v. Balducci Publ'ns, 28 F.3d 769, 774 (8th Cir.1994) (finding likelihood of confusion between humor magazine's parody and beer maker's trademarks).
The Eighth Circuit has expressed its approval of an "expansive interpretation" of the likelihood of confusion beyond competing or similar products, "extending `protection against use of [plaintiff's] mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'" Anheuser-Busch, 28 F.3d at 774 (brackets in original).[2] As CBBB notes, while one purpose of trademark law is to protect competitors, including the good will and reputation established by a trademark's owner, another purpose is to protect *1214 consumers against marketplace deception and confusion by insuring that correct information is available about goods and services. See McCarthy §§ 2:30, 2:33.
The Court finds CBBB has established that defendants used its Marks in connection with the sale of goods or services.

5. Likelihood of Confusion and Actual Confusion.
The hallmark of any trademark infringement claim is consumer confusion. Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc., 130 F.3d 1305, 1308 (8th Cir.1997). The next inquiry is whether the spurious BBB report so resembled genuine BBB reports as to cause confusion among consumers about whether the spurious report came from the CBBB, or was thought to affiliated with it, connected with it, or sponsored by it. See Anheuser-Busch, 28 F.3d at 774; see also Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 398 (8th Cir.1987).
The Eighth Circuit has established six factors relevant to a consideration whether there is a likelihood of confusion: (1) the strength of the mark; (2) the similarity of the marks; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to confuse or to pass its goods off as those of the trademark's owner; (5) evidence of actual confusion; and (6) the degree of care likely to be exercised by prospective customers or purchasers. Minnesota Min. & Mfg., 130 F.3d at 1308; Duluth News-Tribune, 84 F.3d at 1096 ("These factors do not operate in a mathematically precise formula; rather we use them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion.") "Whether likelihood of confusion exists is ultimately an issue of fact; however, factual disputes regarding a single factor do not preclude a court from entering summary judgment." Dream Team Collectibles, Inc. v. NBA Props., Inc., 958 F.Supp. 1401, 1411 (E.D.Mo.1997) (J. Stohr) (citing Duluth News-Tribune, 84 F.3d at 1096). The Court examines each consideration in turn.

i. Strength of the Marks.
The Court must first determine whether CBBB's Marks are strong enough to merit trademark protection. Duluth News-Tribune, 84 F.3d at 1096. The Marks must be classified into one of four categories: (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, or (4) generic. Id. The Eighth Circuit has described these categories as follows:
An arbitrary or fanciful trademark is the strongest type of mark and is afforded the highest level of protection. At the other end of the spectrum, a generic term is one used by the general public to identify a category of goods, and as such merits no trademark protection. Suggestive and descriptive marks fall somewhere in between. A suggestive mark is one that requires some measure of imagination to reach a conclusion regarding the nature of the product. A descriptive mark, on the other hand, immediately conveys the nature or function of the product and is entitled to protection only if it has become distinctive by acquiring a secondary meaning.
Duluth News-Tribune, 84 F.3d at 1096 (internal citations and parenthetical explanations omitted).
The Court concludes that "Better Business Bureau" is a descriptive mark. The words convey meaning too directly to be suggestive, as they describe the intended purpose, function, nature, characteristic or use of CBBB's services, see 2 McCarthy § 11:16, but are too specific to be generic. Compare Nationwide Consumer Testing Institute, Inc. v. Consumer Testing Labs., Inc., 159 U.S.P.Q. 304 (Trademark Tr. & *1215 App.Bd.1968) ("Consumer Testing Laboratories" was a descriptive mark for consumer testing services).
Registration of CBBB's Marks creates a rebuttable presumption that they are valid, distinctive and nonfunctional. Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 869 (8th Cir.1994). Because the "Better Business Bureau," Torch Logo and composite mark of the words "Better Business Bureau" in a semi-circle above the Torch Logo (Reg. No. 1,841,476) are incontestable, it is conclusively presumed that these Marks have acquired secondary meaning. See 15 U.S.C. § 1115(b); Park `N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).
The Court concludes that the two "BBB" Marks and the other composite BBB mark of the words "Better Business Bureau" in a semi-circle above the Torch Logo (Reg. No. 2,073,514) are also descriptive. "An abbreviation of a descriptive term which still conveys to the buyer the descriptive connotation of the original term will still be held to be descriptive." 2 McCarthy § 11:32. Because these Marks are registered, they are presumed distinctive. Aromatique, 28 F.3d at 869. Defendants have not attempted to rebut this presumption, nor have they questioned the separate issue of the Marks' strength, and hence the scope of protection for the Marks, for purposes of determining likely confusion. See 5 McCarthy § 3:155.
The Court concludes that CBBB's Marks are strong, as they have been in use for many years, and have acquired distinctiveness in that consumers recognize the Better Business Bureau name and Marks, and rely upon and trust information obtained in BBB reports. The Marks have previously adjudicated as strong. "For over eighty years, the Council and its predecessors have operated continuously and extensively using the [Marks]. The Council currently licenses these marks in all fifty states." Council of Better Bus. Bureaus, Inc. v. Better Bus. Bureau, Inc., 1999 WL 288669, *4 (N.D.N.Y. Mar. 30, 1999). Evidence of intentional copying of the Marks, which is present in this case, is also probative of secondary meaning. See 2 McCarthy § 15:38; Aromatique, 28 F.3d at 871. The Court finds this factor weighs in favor of the finding of a likelihood of confusion.

ii. Similarity of the Marks.
The second factor concerns the similarity between the registrant's Marks and the alleged infringer's marks. Minnesota Min. & Mfg., 130 F.3d at 1308. On their face, the spurious BBB reports purported to be genuine BBB reports. The marks used by defendants on the spurious BBB reports are indistinguishable from the CBBB's Marks. The Eighth Circuit has stated that when evaluating whether marks are similar, the issue "is not whether the public would confuse the marks, but whether the viewer of an [allegedly] infringing mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 399 n. 4 (8th Cir. 1987) (citation omitted) (emphasis in original). The Court finds that defendants' marks, which are indistinguishable from CBBB's Marks, are confusingly similar in that ordinary consumers would likely conclude that defendants and the CBBB share a common source, affiliation, connection or sponsorship. See Anheuser-Busch v. Balducci Publ'ns, 28 F.3d at 774. The Court finds this factor weighs in favor of the finding of a likelihood of confusion.

iii. Degree of Competition.
The third factor concerns the degree to which the parties' products or services *1216 complete with each other. Minnesota Mining & Mfg. Co., 130 F.3d at 1308. CBBB asserts that defendants used the spurious BBB reports as purported compilations of New Horizons' BBB complaint history, and this is precisely the type of service for which the BBB generates authentic business reliability reports.
Defendants respond that CBBB's assertion "misses the point." Relying on their earlier contention that trademark infringement requires direct competition, defendants state there is no evidence that consumers thought Bailey & Associates was in the business of selling reports about business, nor is there any evidence that consumers thought they were purchasing CBBB travel club memberships. Defs.' Mem.Opp. at 8.
Defendants' argument is without merit. Defendants' narrow interpretation of the Lanham Act is without support. The Court finds the evidence shows that genuine BBB reports and the spurious BBB reports used by defendants both were intended to serve the same purpose: to give consumers some indication of the reliability of a given business entity, specifically New Horizons and other Bailey & Associates entities. As a result, the Court find this factors weighs in favor of the finding of likelihood of confusion.

iv. Intent to Confuse.
The fourth factor concerns the alleged infringer's intent to confuse consumers, or to "pass off" its product as that of the registrant. Duluth News-Tribune, 84 F.3d at 1096. In this case, the undisputed evidence shows defendants used the spurious BBB reports to generate consumer confidence in the reliability of their business, in part to induce consumers to purchase Memberships and in part to dissuade them from directly contacting the BBB and obtaining a genuine BBB report. Defendants did not have CBBB's consent to use the Marks, nor did they have any reason to believe they did. Nonetheless, defendants created and displayed spurious BBB reports to consumers, representing that they were genuine BBB reports. In addition, while defendants were using the Marks in documents which stated there were no New Horizons member complaints, defendants possessed information and documents showing that New Horizons members had complained to the BBB. Thus, defendants knew that the statements attributed to the BBB in the spurious BBB reports were false.
Defendants again assert that CBBB has "missed the point," because defendants were not passing off their travel club Memberships as those of the CBBB. Defendants state, "While the evidence might show and a juror could believe that customers of Defendant Bailey & Company thought they were viewing a genuine Better Business Bureau Report, for the purposes of this analysis that fact is irrelevant. The question is: did clients of Defendants Bailey & Company think they were buying CBBB travel club memberships?" Defs.' Mem.Opp. at 8.
The Court disagrees with defendants. In making this argument, defendants do not contend that consumers were not confused or deceived by the use of the Marks on the spurious BBB reports. Rather, defendants take issue with the nature of the confusion and deception required for a Lanham Act violation, but are unable to cite any pertinent legal authority, either statutory or case law, which supports their interpretation of the Lanham Act. In 1962, Congress broadened the scope of the Lanham Act by eliminating from it a "previously existing requirement that the confusion or deception must relate to the `source or origin of such goods or service.'" Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d *1217 1004, 1010 (5th Cir.1975) (statutory citation omitted). The "source or origin" language was omitted to "specifically allow any kind of confusion in support of a trademark infringement action." Marathon Mfg. Co. v. Enerlite Prods. Corp., 767 F.2d 214, 221 (5th Cir.1985) (emphasis added). "The confusion that is remedied by trademark and unfair competition law is confusion not only as to source, but also as to affiliation, connection or sponsorship." 3 McCarthy § 23:8.
The Court finds the evidence is that defendants intentionally and purposely utilized CBBB's Marks in order to confuse consumers, and/or to make consumers believe they were seeing genuine BBB reports. The Court finds this factor weighs in favor of the finding of the likelihood of confusion.

v. Incidents of Actual Confusion.
The fifth factor is evidence of actual confusion. Minnesota Min. & Mfg., 130 F.3d at 1308. CBBB asserts that it is beyond dispute defendants' use of the Marks caused actual consumer confusion. Consumer Sandra Wood testified that she believed the spurious BBB report shown to her by a New Horizons representative was genuine until a court dispute two years later. Consumer Robert Crawford testified that he believed the document he was shown, containing a spurious BBB letterhead, was genuine until he called the BBB to complain about his Membership. Consumer Mary Preston testified that she believed a BBB letter she was shown was genuine until she called the BBB to register a complaint about New Horizons. Consumer Christy Parker stated that she believed the spurious BBB document shown to her in July 2000 was genuine until she was told by a competitor of defendants' that it was not.
"Convincing evidence of significant actual confusion occurring under actual marketplace conditions is the best evidence of a likelihood of confusion." 3 McCarthy § 23:13; David Sherman Corp. v. Heublein, Inc., 340 F.2d 377, 381 (8th Cir.1965). "[W]hen determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." Duluth News-Tribune, 84 F.3d at 1098 (citation omitted).
The Court finds CBBB's evidence of actual confusion to be significant and convincing. CBBB offers four incidents of actual confusion, in which consumers state they believed that spurious BBB reports shown to them by New Horizons representatives were actually genuine BBB reports showing New Horizons' business history. In some instances, the consumers relied on the spurious BBB reports in making the decision to purchase a Membership. This evidence is entitled to considerable weight. The Court finds this factor weighs strongly in favor of the finding of a likelihood of substantial confusion.

vi. Degree of Care Likely to be Exercised by Customers.
The sixth factor is the degree of care expected of an ordinary purchaser. Duluth News-Tribune, 84 F.3d at 1099. Plaintiff CBBB asserts that given the BBB logo on the spurious reports, and the fact that the reports purported on their face to be BBB reports, consumers would naturally assume that the documents were what they pretended to begenuine reliability reports issued by the CBBB or its Member BBBs.
The Court agrees. An ordinary consumer, exercising a reasonable degree of case, would assume that a document shown to her, bearing the name and logo of the Better Business Bureau and purporting to contain the reliability history of a business from which she was considering the purchase *1218 of a relatively expensive travel club Membership, was a genuine BBB reliability report. The Court finds this factor weighs in favor of the finding of a likelihood of confusion.
In sum, the Court's application of the relevant factors leads to the conclusion that no genuine issues of material fact remain with respect to the issue of a likelihood of confusion caused by defendants' use of CBBB's Marks.

6. Appropriateness of Summary Judgment in this Case.
"When, as in this case, a trademark dispute centers on the proper interpretation to be given to the facts, rather than on the facts themselves, summary disposition is appropriate." Duluth News-Tribune, 84 F.3d at 1099 (citation omitted)
The foregoing evaluation of the relevant six factors leads to the conclusion that no factual dispute exists as to the likelihood of confusion, and that the likelihood of confusion is established. The undisputed evidence shows that defendants have shown and distributed to consumers spurious BBB reports which bear copies of CBBB's registered Marks and which purport to be genuine BBB reports. In so doing, defendants have represented to the consuming public that the spurious BBB reports were accurate and were from the Better Business Bureau, when in fact they were not. There is strong evidence of actual confusion resulting from defendants' conduct, as consumers relied on the information contained in the spurious BBB reports to make decisions to purchase travel club Memberships.
The evidence shows that defendants Robert Williams, Jeffrey D'Amato and Debra D'Amato participated directly in infringing activities. Defendant William Bailey, owner and President of Bailey & Associates, Inc., participated vicariously in the infringement or ratified or adopted these defendants' infringement by failing to take action for two years after he knew of infringing use by New Horizons employees. See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (manufacturer could be held liable for contributory infringement when it continued distributing drugs to a pharmacist knowing he was mislabeling them with plaintiff's trademark); Fonovisa v. Cherry Auction, Inc., 76 F.3d 259, 264-65 (9th Cir.1996) (complaint alleging that "swap meet" operator which knew merchants were selling infringing articles stated cause of action for contributory infringement); Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1184 (11th Cir.1994) ("corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for [trademark] infringement without regard to piercing of the corporate veil"); Hard Rock Cafe Licensing Corp. v. Concession Serv., Inc., 955 F.2d 1143, 1149 (7th Cir.1992) (flea market operator would be liable for contributory infringement if it was "willfully blind" to vendor sales of infringing merchandise); David Berg and Co. v. Gatto Int'l Trading Corp., 884 F.2d 306, 311 (7th Cir.1989) ("every person actively partaking in, lending aid to, or ratifying and adopting [infringing] acts is liable equally with the party itself performing these acts."); Barry v. Legler, 39 F.2d 297, 300-01 (8th Cir.1930) (corporate officer who knows or reasonably should know of wrongful conduct by corporate agents and fails to take reasonable steps to stop it is liable); see also 4 McCarthy § 25:23 ("Since trademark infringement and unfair competition are torts, the doctrine of joint tortfeasors is applicable.")
Defendants Bailey & Associates, Inc. and Winner's Circle of Chicago, Inc. are liable for the infringement of their officers and agents. See, e.g., Mead Johnson *1219 & Co. v. Baby's Formula Serv., Inc., 402 F.2d 19, 23 (5th Cir.1968) (corporations are liable for the infringements of their agents); cf. American Tel. & Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1430-31 (3d Cir.1994) (under Section 43(a) of Lanham Act, corporate defendant could be held responsible for the alleged misrepresentations of independent sales representatives, as common law concepts of agency, apparent authority and vicarious liability apply).
Section 32(1) of the Lanham Act gives the registrant of a trademark a civil right of action where its registered mark is used in commerce without its consent, in connection with the sale or distribution of a product or service, where the "use is likely to cause confusion, or to cause mistake, or to deceive...." 15 U.S.C. § 1114(1). For the foregoing reasons, the Court concludes that CBBB has met its burden to show it is entitled to summary judgment against all defendants as a matter of law on its trademark infringement claim under § 32(1) of the Lanham Act.

B. Counterfeiting, §§ 32(1) and 34(d)(1)(B) of Lanham Act.
CBBB also moves for summary judgment against defendants on the issue of counterfeiting under Sections 32(1) and 34(d)(1)(B) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1116(d)(1)(B).
A defendant is liable for counterfeiting under the statute when it is shown that the defendant (1) infringed a registered trademark in violation of 15 U.S.C. § 1114(1), and (2) intentionally used the registered trademark knowing that it was counterfeit. 15 U.S.C. §§ 1116(d), 1117(b); Babbit Electronics, 38 F.3d at 1181. Section 45 of the Lanham Act defines "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. A "counterfeit mark" is "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew that such mark was so registered." 15 U.S.C. § 1116(d)(1)(B).
Plaintiff CBBB asserts that this case involves the use of a counterfeit registered mark that is in use for services distributed by CBBB and its member BBBs, specifically the issuance of BBB reports for consumers to use in assessing a business. Defendants used the Marks in a document purporting to be the same thing. Accordingly, CBBB asserts that defendants' use fits precisely within the ambit of the counterfeiting provisions of the Lanham Act. See Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong.Rec. H12076, at 12078-79 (1984) (counterfeiting statute is intended for cases where the defendant uses a registered mark "in connection with goods or services for which the mark is ... registered.")
Plaintiff CBBB asserts that the undisputed facts show that defendants used spurious CBBB Marks to sell their services in a way that clearly implied such use was authorized by the CBBB. CBBB asserts that the strength of the false impression was due, in part, to the fact that defendants used the spurious marks in the same context for which CBBB is nationally known"protecting responsible business and the public against abusive business practices and for establishing and maintaining legitimate advertising and merchandising practices...." (Facts ¶ 1.)
Plaintiff CBBB asserts that because defendants intentionally used counterfeit BBB Marks, as defined in § 1116(d)(1)(B), in the very context with which the CBBB is affiliated and for the services for which the CBBB Marks were registered, defendants *1220 are liable for counterfeiting under 15 U.S.C. § 1116(d)(1)(B).
Defendants respond that a claim for trademark counterfeiting can lie only against a defendant's counterfeit use of a mark on the same goods or services as are covered by the plaintiff's registration of that mark, citing Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc., 1998 WL 288423, *3, 1998 U.S.Dist. LEXIS 8231, *13 (E.D.Pa.1998). Defendants state that in the Playboy case, the district court concluded the defendant, which operated an Internet website that used Playboy trademarks to advertise hard-core photographs, was not liable for counterfeiting where Playboy trademarks were limited to operating establishments featuring food, drink and entertainment, and were registered in connection with the sale of magazines, certain clothing, personal items, jewelry, caps and perfume, because Playboy failed to allege that the defendants counterfeited its marks on the same goods or services covered by the marks' registration.[3]
Defendants assert that the facts of this case are similar to the Playboy case, because they did not use the CBBB's trademark for the purposes for which it was registered with the Patent and Trademark Office: investigative and information services relative to business and trade practices for protecting responsible business against abusive business practices and for establishing and maintaining legitimate advertising practices. Defendants state there is no evidence they sold or distributed CBBB reports to their customers or attempted to use the CBBB Mark to offer customers investigative and information services relative to business and trade practices. Defendants argue that because there is no evidence they used the Mark to engage in services evaluating business and trade practices, they cannot be liable for counterfeiting under the statute.
Defendants also assert that CBBB's counterfeiting claim is untenable because it is contrary to the purposes of the counterfeiting statute, which is to preclude the sale of non-genuine goods made so as to imitate well-known products and deceive consumers. Defendants observe that nearly all of the reported counterfeiting cases involve situations where the defendant sold items bearing a registered trademark. Defendants assert there is no evidence they ever sold CBBB reports or purported to be the CBBB and offer information or investigative services regarding business or trade practices, and therefore laws intended to protect consumers from purchasing fraudulent goods do not extend to the instant situation. Except with respect *1221 to defendant Bailey, defendants do not respond to CBBB's assertion that their use of the Marks was intentional and for the purpose of deceiving consumers.
Plaintiff CBBB replies that while most of the relatively few counterfeiting cases decided to date under the 1996 amendments to the Lanham Act do concern competing products or services, nothing in those cases or the plain language of the counterfeiting statute precludes a claim when a defendant intentionally fabricates a false document bearing the trademark of a service organization and uses that document in such a way as to confuse consumers into thinking it is the genuine article authorized by the trademark owner, and for the purpose of promoting the defendant's commercial interests.
The CBBB states that under the Lanham Act, the definition of a "counterfeit mark" includes a mark registered for "services sold, offered for sale, or distributed and that is in use...." 15 U.S.C. § 1116(d)(1)(B) (emphasis added). It states that defendants used a counterfeit of a registered mark which is in use for services distributed by CBBB and its member BBBs, namely the issuance of BBB reports to consumers to use in evaluating a business, on unauthorized, inauthentic documents purporting to do the same thing. Thus, CBBB argues, defendants' use fits precisely within the ambit of the counterfeiting provisions of the Lanham Act.
CBBB states that defendants' argument they did not use the Marks to engage in services evaluating business and trade practices misses the point, because defendants used the Marks in a context identical to CBBB's use of the Mark and in the same context for which the Marks were registered, and such use constitutes counterfeiting. Specifically, defendants used the Marks in connection with the very same services distributed by the CBBB, namely BBB reports, letting customers think the phony documents were real. Defendants then distributed the spurious BBB reports containing counterfeits of the Marks in connection with attempts to sell and distribute their Memberships. CBBB states that defendants' argument might have merit if they were being sued because they named their travel product "Better Business Travel," because by doing so, they would have infringed on the Marks if consumers thereby became confused about the relationship between plaintiffs and defendants, but because the Marks would have been used for goods or services unrelated to CBBB's use and registration of the Mark, there would have been no counterfeiting.
Finally, CBBB responds that while the facts of this case are undoubtedly unusual, nothing in the statute or legislative history of the counterfeiting provisions indicates that Congress intended to limit the counterfeiting prohibition to cases where an item bearing a counterfeit mark was sold. CBBB states that Congress, in enacting the counterfeiting provisions, recognized the need for extreme sanctions in cases involving the degree of deception present in cases such as the sale of fake Rolex watches or Gucci handbags. CBBB states that defendants' actions involve the same degree of deception; the only difference is that instead of selling an item bearing the spurious mark, defendants instead used the item as an inducement for a sale.
The Court agrees with CBBB that defendants' method of using CBBB's Marks falls within the scope of the term "counterfeiting" as defined by the Lanham Act. The Court has already determined that defendants infringed registered marks in violation of 15 U.S.C. § 1114(1)(a). The evidence is clear that defendants intentionally, i.e., purposefully, used CBBB's Marks. The inquiry is whether the defendants used the Marks knowing they were *1222 counterfeit. See Babbit Electronics, 38 F.3d at 1181.
Plaintiff CBBB offers the following evidence to show defendants' knowing use of the Marks: In 1997, attorney Robert Swearingen showed a counterfeit BBB report to New Horizons' Vice President and corporate counsel, Michael White. Swearingen told White that New Horizons sales-persons had given it to his clients during the sale of a Membership, and that it was counterfeit. Defendant William Bailey, New Horizons' president and the person with overall responsibility for its sales offices, admits he was told about the use of the counterfeit BBB report in 1997. The record shows Bailey did not attempt to stop the use of the counterfeit BBB reports until 1999, and agents of the company used counterfeit BBB reports as late as October 2000.
Defendant Debra D'Amato, General Manager of New Horizons' St. Louis Office, admitted knowing the BBB did not generate the counterfeit reports. She also knew that defendant Williams used the documents in 1997 and 1998, and she heard that another salesperson used them until 1999. She also testified that no one instructed her to stop using the reports until 2000.
Defendant Jeffrey D'Amato, New Horizons' Vice-President of Sales, who had day-to-day oversight of the New Horizons offices, told New Horizons employees to use the counterfeit reports, and he knew that New Horizons agents inserted information in the reports which was not found on genuine BBB reports.
CBBB does not set forth evidence that defendant Robert Williams used the Marks knowing they were counterfeit.
Based on the foregoing, it is clear that defendants Jeffrey D'Amato and Debra D'Amato used CBBB's trademarks knowing they were counterfeit. Defendant William Bailey is liable for counterfeiting based on his ratification and adoption of the acts of New Horizons employees, in that he waited two years after he knew New Horizons employees were using counterfeit BBB reports before he took action to direct that their use cease.[4] Defendants Bailey & Associates, Inc. and Winner's Circle of Chicago, Inc. are liable for the counterfeiting of their employees, agents, and officers based on principles of respondeat superior. Cf. Am. Tel. & Tel. Co., 42 F.3d at 1433-34.
These defendants knew that documents they and their agents created could not be authentic BBB reports. Cf. Interstate Battery Sys. of Am., Inc. v. Wright, 811 F.Supp. 237, 244 (N.D.Tex.1993) (holding licensee which used trademark on batteries bought from a different source than the trademark owner was a counterfeiter under the Lanham Act). The Court concludes that CBBB has met its burden to show it is entitled to summary judgment as a matter of law on its counterfeiting claim under § 32(1) of the Lanham Act against defendants Bailey & Associates, Inc., Winner's Circle of Chicago, Inc., William Bailey, Jeffrey D'Amato and Debra D'Amato, but not against defendant Robert Williams.

C. Statutory Damages, § 35(c) of the Lanham Act.
Finally, plaintiff CBBB moves for summary judgment that it is entitled to recover *1223 at its election, any time before final judgment herein, statutory damages under Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c), in lieu of defendants' profits or plaintiff's actual losses resulting from the infringing activity.
Section 35(c) provides for the election of statutory damages in a counterfeiting case:
(c) In a case involving the use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of
(1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
(2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.
15 U.S.C. § 1117(c).
Defendants object that the legislative history of Section 35(c) shows it was intended to provide a measure for plaintiffs who are unable to prove damages where a counterfeiter has no record of its unlawful activity. Defendants again make the point they are not competitors with CBBB, noting that plaintiff is a not-for-profit corporation, and state there is no evidence they sold products displaying the CBBB Mark or failed to maintain records. Defendants state that CBBB has no evidence of actual damages, and never filed a cease and desist letter to stop defendants from engaging in the alleged infringing activity. Defendants assert that an award of statutory damages in this case would contravene the purpose of the statute and give CBBB a windfall.
CBBB responds that defendants used a counterfeit of the Marks, and by showing them to consumers as part of the process of selling Memberships, they "use[d]" the counterfeits of the Marks "in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(c). Thus, CBBB contends that all statutory requisites are met and it is entitled to recover statutory damages.
CBBB states that whether or not it suffered actual damages from defendants' counterfeiting is irrelevant to its entitlement to statutory damages, because they are an alternative to actual losses or disgorgement of profits. See Sara Lee Corp. v. Bags of N.Y., Inc., 36 F.Supp.2d 161, 164-65 (S.D.N.Y.1999); Playboy Enters., Inc., 1998 WL 767440, *8 (plaintiff may elect to recover statutory damages for counterfeiting even where "defendants did not have any profits and plaintiff has failed to prove actual damages.")
The Court concludes CBBB is entitled to judgment that it may elect to recover, instead of actual damages and profits, an award of statutory damages "for any such use in connection with the sale, offering for sale, or distribution of goods and services." 15 U.S.C. § 1117(c). Because CBBB distributes its services, it is entitled to avail itself of the Lanham Act's counterfeiting remedies. 15 U.S.C. § 1116(d)(1)(B). The fact that defendants did not sell or try to sell the counterfeit BBB reports is immaterial because they distributed and used them in connection with sales and offers to sell. 15 U.S.C. § 1117(c). The Court finds persuasive CBBB's argument that the fact it does not sell the counterfeited item presents a greater justification for allowing an award *1224 of statutory damages because traditional forms of money damages under 15 U.S.C. § 1117(a)disgorgement of defendants' profits or recovery of plaintiff's actual losses are not readily quantifiable in such a case as this.
This aspect of plaintiff CBBB's motion for summary judgment should therefore be granted.

Conclusion.
For the foregoing reasons, the Court concludes that plaintiff CBBB's motion for partial summary judgment should be granted in part and denied in part, as set forth in this memorandum and order.
Accordingly,
IT IS HEREBY ORDERED that plaintiff Council of Better Business Bureau, Inc.'s motion for partial summary judgment is GRANTED in part and DENIED in part; said motion is GRANTED as to plaintiff CBBB's claims (1) against all defendants in Count I for trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) against defendants Bailey & Associates, Inc., Winner's Circle of Chicago, Inc., William Bailey, Jeffrey D'Amato, and Debra D'Amato in Count I for counterfeiting under Sections 32(1) and 34(d)(1)(B) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1116(d)(1)(B); and (3) that plaintiff is entitled to recover, at its election, statutory damages for counterfeiting as provided under Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c); said motion is DENIED as to plaintiff's claims against defendant Robert Williams in Count I for counterfeiting under Sections 32(1) and 34(d)(1)(B) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1116(d)(1)(B).
An appropriate partial judgment shall accompany this memorandum and order.

PARTIAL JUDGMENT
In accordance with the memorandum and order of this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment is entered in favor of plaintiff Council of Better Business Bureaus, Inc., and against defendants Bailey & Associates, Inc., Winner's Circle of Chicago, Inc., William Bailey, Jeffrey Anthony D'Amato, Debra Lynn D'Amato and Robert Williams on plaintiff's claims against these defendants in Count I for trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).
IT IS FURTHER ORDERED, ADJUDGED and DECREED that judgment is entered in favor of plaintiff Council of Better Business Bureaus, Inc., and against defendants Bailey & Associates, Inc., Winner's Circle of Chicago, Inc., William Bailey, Jeffrey Anthony D'Amato and Debra Lynn D'Amato on plaintiff's claims against these defendants in Count I for counterfeiting under Sections 32(1) and 34(d)(1)(B) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1116(d)(1)(B).
IT IS HEREBY ORDERED, ADJUDGED and DECREED that plaintiff Council of Better Business Bureaus, Inc. is entitled to recover, at its election, statutory damages for counterfeiting as provided under Section 35(c) of the Lanham Act, 15 U.S.C. § 1117(c)
NOTES
[1] The Court is compelled to observe that defendants' response to CBBB's statement of material facts does not comply with either the letter or the spirit of Eastern District Local Rule 4.01(E), which requires the non-moving party to submit a statement of material facts as to which it contends a genuine issue exists, with specific references to the portions of the record upon which the opposing party relies. Defendants' statement of controverted facts is, in many instances, more akin to a general denial than to a factual statement appropriate for the summary judgment stage of a case. Defendants dispute factual statements by CBBB, but cite no contrary authority in the record. See, e.g., CBBB's Facts ¶ 5, Defs.' Response ¶ 1. This Court is "`not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.'" Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996) (quoting White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir.1990)). In other instances, defendants dispute generalized statements, such as that from 1995 to 2000 agents of Bailey & Associates used documents bearing CBBB's Marks and captioned "Better Business Bureau Report," but then do not dispute the detailed factual instances cited in support of the general statement, and contained within the same numbered paragraph. See, e.g., CBBB's Facts ¶ 9, Defs.' Response ¶ 5; CBBB's Facts ¶ 16, Defs.' Response ¶ 11. At other points, defendants dispute CBBB's factual statements as inconsistent with the cited support, but fail to explain how they are inconsistent. See, e.g., Defs.' Response ¶¶ 13-18. Defendants even dispute a verbatim recitation of an allegation admitted in their Answer to plaintiffs' First Amended Complaint. See CBBB's Facts ¶ 24, Defs.' Reponse ¶ 19. Defendants and their counsel should be on notice the Court expects any future submissions under Local Rule 4.01 to comply fully with the requirements of that Rule.
[2] The Eighth Circuit was quoting from McCarthy, Trademarks and Unfair Competition § 24.03, at 24-13 (3d ed.1992). The current citation for the corresponding quotation is 4 J. Thomas McCarthy, McCarthy on Trade-marks and Unfair Competition § 24:6 (4th ed.2001).
[3] The Playboy opinion cited by defendants was an order denying without prejudice plaintiff Playboy Enterprises, Inc.'s motion for leave to amend its complaint to assert a claim of counterfeiting on the basis that the claim would be futile, because Playboy (1) did not allege in its proposed amended complaint that the defendants ever unlawfully utilized plaintiff's "Rabbit Head" design, and thus did not allege facts which stated a valid claim for trademark counterfeiting of that design; and (2) failed to allege that defendants counterfeited its "Bunny" and "Rabbit Head" marks on the same goods or services covered by the marks' registrations; and (3) failed to allege that the Playboy website contained an Internet version of its magazine, and therefore did not allege a valid claim for counterfeiting of the "Playboy" mark, which defendant used in its Internet website. See Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc., 1998 WL 288423, *3-6 (E.D.Pa. June 3, 1998). In a subsequent opinion issued in the same case, the court stated the complaint had been amended to including a counterfeiting claim, and held that Universal Tel-A-Talk, Inc. was liable to Playboy Enterprises for counterfeiting based on its use of the "Playboy" mark in connection with the sale and offering for sale of adult entertainment images on a portion of its website, entitling Playboy to statutory damages. See Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc., 1998 WL 767440, *7-8 (E.D.Pa. Nov. 3, 1998).
[4] See Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir.1989) (it was sufficient knowledge that a retailer "failed to inquire further because he was afraid of what the inquiry would yield. Willful blindness is knowledge enough" for the imposition of counterfeiting liability); see also Babbit Electronics, 38 F.3d at 1184 (corporate officer who, inter alia, ratifies infringing activity is liable for infringement).